**In re Jane DOE.**

No. 00–0224.

Supreme Court of Texas.

June 22, 2000.

Justice O'NEILL delivered the opinion of the Court, joined by Justice ENOCH, Justice BAKER, Justice HANKINSON, and Justice GONZALES and by Chief Justice PHILLIPS as to Parts II and III.

This is an appeal from an order denying a minor's application for a court order authorizing her to consent to an abortion without notifying a parent. After remand from this Court, *see In re Jane Doe*, 19 S.W.3d 249 (Tex.2000) (*"Doe 1(I)"*), the trial court conducted another hearing and found that Jane Doe failed to prove by a preponderance of the evidence that she is sufficiently well informed to have an abortion without parental notification. The court of appeals affirmed. After reviewing the record, we determined that Doe conclusively established the statutory requirements and that she was entitled to consent to the procedure without notifying a parent. We issued an order on March 10, 2000, reversing the court of appeals' judgment, with opinions to follow on the concern that Doe be able to undergo a less risky abortion procedure, if that option was still available to her and that was her decision. The following is our opinion holding that the evidence Doe presented conclusively established that she was "mature and sufficiently well informed" to consent to an abortion without parental notification. *See* TEX. FAM.CODE § 33.003(i).

## I

Abortion is a highly-charged issue that often engenders heated public debate. Such debate is to be expected and, indeed, embraced in our free and democratic society. It is through this very type of open exchange that our Legislature crafted and enacted the particular statutory scheme before us. Our system of government requires the judicial branch to independently review and dispassionately interpret legislation in accordance with the Legislature's will as expressed in the statute. We begin our analysis with an overview of the Pa-

rental Notification Act's judicial bypass procedure and our role in interpreting it.

## A. The Proper Role of Judges

*"[Courts] are under the constraints imposed by the judicial function in our democratic society.... [T]he function in construing a statute is to ascertain the meaning of words used by the legislature. To go beyond it is to usurp a power which our democracy has lodged in its elected legislature.... A judge must not rewrite a statute, neither to enlarge nor to contract it."*

-Felix Frankfurter[1]

*"It is the province of the legislature to make the laws; and of the courts to enforce them."*

Barrett v. Indiana, 229 U.S. 26, 30, 33 S.Ct. 692, 57 L.Ed. 1050 (1913)

In deciding this case we squarely confront the question of whether, as judges, we should apply the Parental Notification Act as it is written by the Legislature or according to our own personal beliefs. In reaching the decision to grant Jane Doe's application, we have put aside our personal viewpoints and endeavored to do our job as judges—that is, to interpret and apply the Legislature's will as it has been expressed in the statute.

■ Unquestionably, in passing the Parental Notification Act the Legislature intended to protect parents' rights by encouraging minors to involve their parents

in the profound decision to proceed with or terminate a pregnancy.[2] The Legislature also chose to provide a mechanism for a minor, under certain circumstances, to obtain an abortion without notifying her parents. In our system of government, it is the Legislature's job to fashion policy. As judges, we respect and defer to the policy choice our Legislature made to encourage parental involvement in such an important matter. Similarly, we respect and defer to the Legislature's policy decision to include a judicial bypass procedure in the statute. Our task is to determine how the Legislature intended that process to work.

## B. The Statutory Proof Standard

In creating the bypass procedure, the Legislature delegated no authority to the courts to determine the grounds upon which to grant a bypass. Rather, it specifically enumerated the grounds that, if shown, require the courts to grant a parental notification waiver. Neither did the Legislature give courts authority to decide the level of proof a minor must show to prove that she is entitled to a bypass. And although the Legislature could have chosen to impose a higher standard of proof, such as by requiring the minor to establish the statutory requisites by "clear and convincing" proof or proof "beyond a reasonable doubt," it did not do so. Instead, it set the level of proof at the lower "preponderance of the evidence" standard.[3] See Tex. Fam.Code § 33.003(i).

1. Record of the Association of the Bar of the City of New York 213 (1947), *reprinted in* Courts, Judges, and Politics, at 414 (Walter F. Murphy & C. Herman Pritchett, eds., 2d ed.1974).

2. And if the projections of the bill's author, state Senator Florence Shapiro, prove accurate, the law will have its intended effect. Senator Shapiro reported that 39 percent of the 5,523 minors who terminated their pregnancies in 1997 did not involve their parents; she further estimated that only 10 percent of those minors would seek a judicial bypass under the statute. Thus, as a result of the Parental Notification Act, the vast majority of minors will now likely involve a parent in

their decisionmaking process. *See* Debate on Tex.C.S.S.B. 30 on the Floor of the Senate, 76th Leg., R.S. (March 17, 1999) (statement of Senator Shapiro) (tapes available from Senate Staff Services Office).

3. The bill's author emphasized that the proof standard was relatively low:

 Senator West: Are we putting judges in a precarious situation to make these determinations based on the research that you've done in other states and is the standard that you are putting in here that a judge makes the determination by a preponderance of the evidence....
 Senator Shapiro: *Lowest level.*

■ The importance of the evidentiary burden is self-evident. As *amicus curiae* the Texas Coalition for Parents' Rights recognizes: "Evidentiary standards express the degree of certainty in the outcome that the factfinder must have. Because interests of differing constitutional and societal value come before courts, differing degrees of certainty are required." (Citations omitted). The Texas Coalition urges this Court to apply a burden of proof similar to the "clear and convincing" standard the Nebraska Supreme Court adopted in *In re Petition of Anonymous 1,* 251 Neb. 424, 558 N.W.2d 784, 787 (1997). But the Nebraska court was free to adopt a heightened burden of proof because the Nebraska legislature did not articulate a proof standard. Our Legislature mandated a proof standard. For this Court to impose a standard different than that our Legislature chose would usurp the legislative function and amount to judicial activism.

## C. The Statutory Scheme

The Legislature could easily have crafted other more stringent standards for a minor to obtain a judicial bypass, constitutional concerns aside.[4] But as it is written, the statute gives the minor who decides to seek a judicial bypass a number of advantages. For instance, the minor is the only party to the bypass proceeding. *See* TEX. FAM.CODE § 33.003. She is entitled to representation by an attorney of her choice or a court-appointed attorney *ad litem,* and the court must appoint a guard-ian *ad litem* to advocate for the minor's best interests. *See id.* § 33.003(e). The Legislature chose not to provide for anyone to represent any other interests. And although the Family Code requires proof by clear and convincing evidence in other matters, the Legislature deliberately chose proof by a preponderance of the evidence in bypass proceedings. *Compare id.* § 33.003(i) *with id.* § 161.001. Further, if the trial court rules in the minor's favor, there is no appeal, but if it rules against her, she has access to two levels of appellate review. *See id.* § 33.004. Finally, the bypass statute's default provisions favor the minor. If the trial court fails to rule on the minor's application and issue written findings of fact and conclusions of law within the period allowed, the statute deems the application granted and the minor may have an abortion without notifying her parents. *See id.* § 33.003(h). Likewise, if the court of appeals does not rule within its allotted time, the statute deems the appeal granted. *See id.* § 33.004(b).

■ This Court must interpret the statute as it is written; we are not free to ignore the judicial bypass language. The statute allows a minor to avoid notifying a parent if she can show that: (1) she is mature and sufficiently well informed to make the decision to obtain an abortion without notifying a parent; (2) notifying a parent would not be in her best interest; or (3) notifying a parent may lead to physical, sexual, or emotional abuse of the minor. *See id.* § 33.003(i). Concerning

---

Debate on Tex.C.S.S.B. 30 on the Floor of the Senate, 76 th Leg., R.S. (March 17, 1999) (statements of Senators West and Shapiro) (tapes available from Senate Staff Services Office) (emphasis added).

**4.** The United States Supreme Court has never decided whether a notification statute like Texas's must include a bypass provision to pass constitutional muster. *See Ohio v. Akron Reprod. Health Ctr.,* 497 U.S. 502, 510, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990). Even so, at the second reading on Senate Bill 30, Senator Shapiro suggested that a judicial bypass procedure was not constitutionally required:

In fact, just two weeks ago, the State of Virginia's parental notification bill went to the [Supreme Court] and the [Supreme Court] decided that their system works. And I want to mention *they have no judicial bypass, no bypass whatsoever. Their law says, A parent must be notified, period.*
Debate on Tex.C.S.S.B. 30 on the Floor of the Senate, 76 th Leg., R.S. (March 17, 1999) (statement of Senator Shapiro) (tapes available from Senate Staff Services Office) (emphasis added).

the first ground, the Legislature could have required that the minor be *fully* informed, rather than *sufficiently well* informed. The Legislature had before it—but rejected—at least one bill that would have required physicians to supply specified, detailed information about abortion procedures and alternatives to all women, including minors, in order to obtain their informed consent. *See* Tex. S.B. 65, 76th Leg., R.S. (1999). But the Legislature opted in the Parental Notification Act to impose only the more general requirement that a minor be "sufficiently well informed."[5] Moreover, to meet the third exception, the Legislature could have required the minor to show that notifying the parents *would* lead, or even *would likely* lead to abuse of the minor rather than the lower standard the Legislature chose—that notification *may* lead to abuse. We do not mean to imply that all these more stringent standards would ultimately pass constitutional muster, but only point out that the Legislature made clear and deliberate choices about the statutory wording.

That the Legislature chose this particular statutory scheme does not mean that it did not intend the bypass procedure to be meaningful, as we said in *Doe 1(I)*. *See* 19 S.W.3d at 255. There, we looked to other states' jurisprudence interpreting the laws upon which our Legislature modeled our statute. We did so to ascertain what the Legislature intended that a minor must show to demonstrate that she is "mature and sufficiently well informed" to make the decision to obtain an abortion without notifying a parent. The factors we articulated there, and which we apply in this case, reflect other states' experiences, which are

consistent with this Court's effort to determine what the Legislature intended by the words it chose.

## D. The Legislative History

 Senate Bill 30's author and sponsor have filed an *amicus* brief, joined by other legislators,[6] to "provid[e] information regarding the legislative intent" and suggesting that our decisions in *Doe 1(I)*, *Doe 2*, *Doe 3*, and *Doe 4(I)* interpreting the three statutory prongs do not set a high enough standard. We note that it is not the function of this Court to set the standard, but rather to interpret the standard the Legislature set. We further note that "courts construing statutory language should give little weight to post-enactment statements by legislators. Explanations produced, after the fact, by individual legislators are not statutory history, and can provide little guidance as to what the legislature collectively intended." *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 328–29 (Tex.1994) (HECHT, J., concurring and dissenting) (citations omitted); *see also Rogers v. Frito–Lay, Inc.*, 611 F.2d 1074, 1082 (5th Cir.1980) (what happened after a statute's enactment may be history and it may come from members of Congress, but it is not part of the *legislative history* of the original enactment); *General Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 923 (Tex.1993). We believe the Parental Notification Act's legislative history supports our decision.

The *amici* argue that the Legislature intended that a bypass should be "rare" and "exceptional." And the legislative history reflects that the legislators believed that only a very small number of minors—ten percent of the thirty-nine percent of

---

5. As the Bill's House sponsor, Representative Delisi, observed, the Parental Notification Act is *not* an informed consent statute. *See* Hearing Before the House Comm. on State Affairs, 76th Leg., R.S. (April 19, 1999) (statement of Representative Delisi) (audio available at http://www.house.state.tx.us/house/commit/archive/c450.htm or tapes available from House Video and Audio Services).

6. Nine out of thirty-one senators, and forty-seven out of one hundred and fifty representatives, comprise the *amici*— representing less than one-third of the Legislature. Thus, contrary to Justice Abbott's assertion, the amicus brief does not make clear that the Court has guessed wrong in discerning the intent of the Legislature.

minors who did not involve their parents before the Act's passage, or about 216 minors—would seek a bypass. *See* FISCAL NOTE, Tex.C.S.S.B. 30, 76th Leg., R.S. (1999); Debate on Tex.C.S.S.B. 30 on the Floor of the Senate, 76th Leg., R.S. (March 17, 1999) (statement of Senator Shapiro) (tapes available from Senate Staff Services Office). In this sense, it is true that the Legislature thought the statute would make it harder for minors to obtain abortions without notifying a parent and that few requests for judicial bypass were anticipated. But once a bypass was sought, it is less clear that the legislators intended them to be "rare[ly]" granted or intended to construct an "exceptional" evidentiary barrier. While the fiscal note for Senate Bill 30's committee substitute reflects the Department of Health's *economic* assumption that "50 percent of applications filed by minors are denied and appealed,"[7] FISCAL NOTE, Tex.C.S.S.B. 30, 76th Leg., R.S. (1999), a number of statements by the bill's authors, sponsors, and sponsors of companion legislation, including some of the *amici,* suggest that the Legislature did not contemplate as strenuous a statutory burden for the minor as the amici now argue.

For example, Representative Wohlgemuth, the author of the House companion to Senate Bill 30, described the judicial bypass as "*an extremely low bar* to begin with" and represented that "obtaining a bypass is not going to be a problem." *See* Debate on the Floor of the House, 76th Leg., R.S. (May 22, 1999) (statement of Representative Wohlgemuth) (audio available at http://www.house.state.tx.us/audio/archivhc.htm or tapes available from House Video and Audio Services) (emphasis added). She noted that, although she would personally like to see a higher barrier, over ninety percent of the judicial bypasses were granted in other states with similar bypass provisions. *See id.*

To allay concerns some legislators voiced that obtaining a judicial bypass would be too onerous for a minor, Senator Shapiro described an attorney's experience who works with Planned Parenthood in Nebraska representing minors who apply for a waiver under Nebraska's similar bypass procedure: "in all of the years that she's done this, one minor child, *one,* that was turned down, not only by the district court, but also by the court of appeals. And the reason this child was turned down was because she was 12 years old. Now that's real world." *The Parental Notification Act: Hearing on Tex.C.S.S.B. 30 Before the Senate Comm. on Human Services,* 76th Leg., R.S. 24 (March 10, 1999) (statement of Senator Shapiro) (transcript available from Senate Staff Services Office) (emphasis added). Senator Shapiro emphasized in Senate floor debate that, under the comparable Nebraska bypass procedure (which, we note, applies a higher "clear and convincing" proof standard), "ninety-nine percent" of bypasses had been granted. *See* Debate on Tex.C.S.S.B. 30 on the Floor of the Senate, 76th Leg., R.S. (March 17, 1999) (statement of Senator Shapiro) (tapes available from Senate Staff Services Office).[8]

---

7. We do not know the percentage of judicial bypasses that the trial courts are denying. But the fiscal note's economic assumption comports with our percentage thus far. Of the two cases in which we have rendered a final decision, we granted an application in this case and denied another in *In re Jane Doe,* 19 S.W.3d 337 (Tex.2000) (*"Doe 4(II)"*).

8. JUSTICE HECHT suggests that we have selectively quoted the statute's legislative history, citing "contrary statements" in the record. But the statements he excerpts have little or no bearing on the question of the evidentiary burden the Legislature expected minors to face in judicial bypass proceedings. For example, Senator Bernsen's reference to "small exceptions" alludes to the number of minors who would need to resort to the bypass procedure because they are not blessed with loving, supporting families. *See The Parental Notification Act: Hearing on Tex.C.S.S.B. 30 Before the Senate Comm. on Human Services,* 76th Leg., R.S. 4 (March 10, 1999) (statement of Senator Bernsen) (transcript available from Senate Staff Services Office). Representative Delisi's "rare cases" comment was in re-

While the *amici* legislators now express disagreement with how we read the Legislature's enactment, we can only apply an interpretation that comports with the statute's existing plain language, structure, and legislative history. If the Legislature, as a body, agrees with *amici* that we misunderstood their intent, it is the Legislature's prerogative to amend the statute to give us different guidance. This is precisely how the separation of powers doctrine should work. While we respect the *amici's* views, we are aware that "[j]udges who pay attention to subsequent expressions of legislative intent not embodied in any statute may break rather than enforce the legislative contract." RICHARD POSNER, THE FEDERAL COURTS 270 (1985).

### E. Why the Court Ruled with Opinion to Follow

The Court granted Doe's application on March 10th, noting that opinions would follow. We did so because the record indicated both that Doe was entitled to a bypass and out of concern that any further delay might expose her to greater risk. Doe testified that a sonogram performed on February 19, 2000, showed that she was eleven weeks and one day pregnant as of that date. She therefore was fourteen weeks pregnant when we issued our order on March 10. Evidence admitted at the hearing indicated that the "safest method"

for performing an early abortion, a suction curettage or vacuum aspiration procedure, is used until the fourteenth week of pregnancy. *See generally Women's Medical Prof'l Corp. v. Voinovich*, 130 F.3d 187, 198 (6th Cir.1997) (stating "[s]uction curettage can sometimes be performed up to the fifteenth week of pregnancy"). There was also evidence that the usual method for a second trimester abortion is dilation and evacuation, a longer, more complicated, and more invasive procedure. Other evidence indicated that the risk of abortion increases as the pregnancy advances. *See generally City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 467, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (O'Connor, J., dissenting) (quoting bulletin of the American College of Obstetricians & Gynecologists: "Regardless of advances in abortion technology, midtrimester terminations will likely remain more hazardous, expensive, and emotionally disturbing for a woman than early abortions."), *overruled on other grounds by Planned Parenthood of So. Pa. v. Casey*, 505 U.S. 833, 882, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Greenville Women's Clinic v. Bryant*, 66 F.Supp.2d 691, 705 (D.S.C.1999) (stating "[i]t is undisputed that second trimester abortions are significantly more risky to the health of women than first trimester abortions."). We issued our order on the concern that Doe be able to undergo the

sponse to a suggestion that some types of nonjudicial bypass, such as a clergy or counselor bypass, might be appropriate. She said, "And you're certainly right that in rare instances when it's not appropriate to tell the girl's parents then the judge of that court of law is appropriate because they're duly sworn to uphold ... the best interest of the child." *See* Hearing Before the House Comm. on State Affairs, 76th Leg., R.S. (April 19, 1999) (statement of Representative Delisi) (audio available at http://www.house.state.tx.us/house/commit/archive/c450.htm or tapes available from House Video and Audio Services ). The quotes from Representatives Gray and King are found within discussions of *other bills*, not Senate Bill 30. Representative Gray used the term "exceptional" to describe the circumstances in which some type of bypass is constitution-

ally mandated; that is, when the minor has "abusive or neglectful parents or parents who will not assume their parental rights." *See* Hearing Before the House Comm. on State Affairs, 76th Leg., R.S. (April 19, 1999) (statement of Representative Gray) (audio available at http://www.house.state.tx.us/house/commit/archive/c450.htm or tapes available from *House Video and Audio Services*). And Representative King's point was not that parental involvement would be *required* in the vast majority of cases, but that parents need to be involved in the vast majority of cases. *See* Hearing Before the House Comm. on State Affairs, 76th Leg., R.S. (April 19, 1999) (statement of Representative King) (audio available at http://www.house.state.tx.us/house/commit/archive/c450.htm or tapes available from House Video and Audio Services).

less risky suction curettage procedure, if that option was still available to her and that was her decision. While the stage of Doe's pregnancy at the time of the hearing and her doctor's general policies about the procedure are in the record, the exact date that Doe would no longer be eligible for the safer procedure is not. Any significant delay would have guaranteed that Doe could not have the safer procedure. JUSTICES HECHT and OWEN contend that we were wrong, and from their reading of the record the time for performing the safer procedure had just passed. The record does not definitively settle the issue, and we made our decision on the side of the minor's safety.

Additionally, Doe initiated these proceedings more than a month before our March 10th order. Thus, we had to also consider that any additional delay might call into question whether the proceedings were sufficiently expeditious to pass constitutional muster. *See Ohio v. Akron Ctr. for Reprod. Health,* 497 U.S. at 513, 110 S.Ct. 2972; *Bellotti v. Baird,* 443 U.S. 622, 644, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). Moreover, the rules governing these proceedings specifically provide that "[t]he Court must rule as soon as possible." TEX. PARENTAL NOTIFICATION R. 4.3. The Parental Notification Rules expressly recognize that the expedited nature of these proceedings may require a court of appeals to issue its opinion as many as sixty days after rendering judgment. *See* TEX. PARENTAL NOTIFICATION R. 3.3(e). While Rule 3.3, by its terms, applies only to the intermediate courts, the concept underlying the rule is entirely consistent with requiring this Court to rule as soon as possible. And although JUSTICES HECHT AND OWEN

assert that Doe did not seek expedited relief in this Court, her notice of appeal specifically stated, in large, bold-faced type: "**PLEASE EXPEDITE.**" [9]

JUSTICES HECHT AND OWEN also suggest, erroneously, that we issued our March 10th order without deliberating the merits of Doe's appeal. Because the judicial canons prohibit us from disclosing the substance or course of our deliberations, we cannot describe the process leading to our decision to issue the order.[10] Nevertheless, any suggestion that we issued our March 10th order without a majority consensus on the merits is incorrect because a majority consensus was necessary to issue the order. Moreover, although not our standard practice, we have previously issued orders with opinions to follow. In *Texas Water Commission v. Dellana,* we conditionally granted a writ of mandamus with an opinion to follow. *See* 849 S.W.2d 808, 809 n. 1 (Tex.1993) (citing 36 TEX. SUP.CT. J. 556 (Feb. 17, 1993)). And more recently, in *Republican Party v. Dietz,* we granted a stay with an opinion to follow that provided all the relief requested. *See* 940 S.W.2d 86, 87, 94 (Tex.1997); *see also, e.g., Davenport v. Garcia,* 837 S.W.2d 73, 73 (Tex.1992); *Painter v. Shaner,* 667 S.W.2d 123, 124 (Tex.1984); *Coalson v. City Council of Victoria,* 610 S.W.2d 744, 747 (Tex.1980). While we acknowledge that this procedure is not routine, the nature of these proceedings and the record presented necessitated it in this case.

### F. Respecting the Rule of Law

The United States Supreme Court has observed that abortion is a divisive and highly-charged issue. *See Casey,* 505 U.S.

9. We also note that we do not stand alone in following this procedure in these unique cases. *See, e.g., In re Jane Doe,* 126 N.C.App. 401, 485 S.E.2d 354, 354 (1997); *In re Mary Moe,* 25 Mass.App.Ct. 931, 517 N.E.2d 170, 171 (1987); *In re Mary Moe,* 18 Mass.App.Ct. 727, 469 N.E.2d 1312, 1314 (1984).

10. Canon 3, part B(11) of the Code of Judicial Conduct provides that "[t]he discussions,

votes, positions taken, and writings of appellate judges and court personnel about causes are confidences of the court and shall be revealed only through a court's judgment, a written opinion or in accordance with Supreme Court guidelines for a court approved history project." TEX.CODE JUD. CONDUCT Canon (3)(B)(11).

at 866, 869, 112 S.Ct. 2791. Thus, we recognize that judges' personal views may inspire inflammatory and irresponsible rhetoric. Nevertheless, the issue's highly-charged nature does not excuse judges who impose their own personal convictions into what must be a strictly legal inquiry. We might personally prefer, as citizens and parents, that a minor honor her parents' right to be involved in such a profound decision. But the Legislature has said that Doe may consent to an abortion without notifying her parents if she demonstrates that she is mature and sufficiently well informed. As judges, we cannot ignore the statute or the record before us. Whatever our personal feelings may be, we must "respect the rule of law." *Casey*, 505 U.S. at 868, 112 S.Ct. 2791.

## II

### A. Background

Jane Doe is a pregnant, unmarried minor soon to be eighteen.[11] She lives at home with her parents and has not been emancipated. She sought an order from the trial court allowing her to consent to an abortion without notifying either of her parents. *See* TEX. FAM.CODE § 33.003. Doe retained her own attorney, and the trial court appointed a guardian *ad litem*. *See id.* § 33.003(e). At the conclusion of a hearing, the trial court denied Doe's application and issued findings of fact and conclusions of law. *See id.* § 33.003(h), (i), (j). Doe appealed to the court of appeals, which affirmed the trial court's judgment. *See id.* § 33.004(a). She now appeals to this Court. *See id.* § 33.004(f).

This is Doe's second appeal. Her previous appeal was our first opportunity to examine the requirements of the Texas parental notification statute. *See In re Jane Doe 1(I)*, 19 S.W.3d at 257. In that opinion, we reversed the lower courts' orders and remanded the application to the

trial court for further proceedings in the interests of justice. There, we only considered the first statutory ground—that the minor is "mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents." TEX. FAM.CODE § 33.003(i). The other two statutory grounds were not raised in that appeal, nor are they here.

■ As we have explained, a minor who seeks to obtain a judicial bypass under the first prong of the statute must prove two elements: (1) that she is mature, *and* (2) that she is sufficiently well informed. *See id.* If she proves both parts by a preponderance of the evidence, she is entitled to a bypass. *See id.* Thus, a trial court can deny a minor's application by finding that she failed to prove either or both elements. The trial court predicated denial in this case on its finding that Doe did not satisfy the second element and made no finding regarding her maturity. We conclude, however, that Doe conclusively established that she was sufficiently well informed to obtain a judicial bypass. Consequently, we first consider how to review the trial court's nonfinding on maturity.

### B. Maturity

■ Doe does not have the burden of proving in this Court that she is mature. That is because, as we explain below, a minor such as Doe, who is appealing the denial of her application under the first prong of the statute, only needs to conclusively refute the trial court's actual findings. Because the trial court found as fact that Doe was not sufficiently well informed, for us to grant her application the record must establish the converse as a matter of law. But the trial court's failure to find that Doe was not mature does not

11. We recite the state of the record at the time of the underlying proceedings. Since that time, Doe has turned eighteen. Although she could have obtained an abortion after her eighteenth birthday without notifying her parents, she did not wish to undergo the procedure at that late date.

require her to conclusively establish her maturity to prevail on appeal. This distinction is, perhaps, unique to proceedings under this statute, but the statutory scheme in place requires it, as well as the Parental Notification Rules this Court adopted under the statute.

This statutory scheme requires both a timely and complete judgment to support the denial of a minor's bypass application. First, if the trial court does not hold a hearing or rule on a minor's application within the statutory time limits, the application is granted as a matter of law. *See* TEX. FAM.CODE § 33.003(h). In addition, if the trial court holds a hearing and denies an application within the allotted time, but does not also issue written findings of fact and conclusions of law, the application is deemed granted, thereby implying findings contrary to the trial court's judgment. *See id.*

■ A trial court that fails to make a finding on one of the two elements of the first statutory prong does not run afoul of these requirements because a negative finding on only one element supports denial of the minor's application. But because the minor must establish both elements to succeed, an appellate court that determines that the minor conclusively established the element on which the trial court based its denial must confront the effect of the trial court's failure to make a finding on the other element. This failure to find creates uncertainty, because it could reflect either that the minor met her burden of proof on that element or that she did not. By providing that an application is deemed granted if a trial court fails to make required findings, the statute indicates that we must resolve this uncertainty in the minor's favor if she has put on evidence of the element the trial court did not find. Additionally, it is contrary to the expedited nature of these proceedings to require a remand when the trial court fails to issue particular findings. After all, our own rules prohibit courts of appeals from remanding under any circumstances. *See*

TEX. PARENTAL NOTIFICATION R. 3.3(b). For these reasons, an omitted element should be deemed to have been found in the minor's favor if there is some evidence to support the finding. Here, Doe presented evidence that she is mature; we therefore deem that the trial court found this element in her favor.

In her dissent, JUSTICE OWEN argues that "well-established common-law principles regarding appellate review" require us to recognize an implied finding that Doe is not mature as though this were an omitted element of Doe's claim. This purported "common-law" principle, and most of the cases cited to support it, are based upon Texas Rule of Civil Procedure 299, which provides that, when one or more elements of a claim or defense have been found, "omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment." TEX.R. CIV. P. 299. Thus, the argument goes, if there is some evidence supporting the trial court's failure to find that the minor is mature, the judgment must be affirmed.

■ JUSTICE OWEN acknowledges that Rule 299 conflicts with section 33.003 and does not apply. But even under its general principles, omitted findings are only supplied if they are necessary to the judgment. *See, e.g., Wisdom v. Smith,* 146 Tex. 420, 209 S.W.2d 164, 166–67 (1948); *Bednarz v. State,* 142 Tex. 138, 176 S.W.2d 562, 563 (1943). As we have explained, a negative finding on one element of the first prong is alone sufficient to support denial of the application. Thus, an implied finding on the second element is not necessary to the judgment and the general principle behind the rule does not authorize such a finding. Furthermore, as we have explained, a deemed finding on an omitted element against the minor would be contrary to the Legislature's intent in deeming an application granted if the trial court fails timely to make findings.

For these reasons, we cannot infer that the trial court based its decision on a determination that Doe was not mature. Rather, we consider whether Doe established that she is sufficiently well informed to make the decision to consent to an abortion without notifying a parent.

## C. Sufficiently Well Informed

■ In *Doe 1(I)*, we set out three elements of proof necessary for this determination. First, the minor must show that she has obtained information from a health-care provider about the health risks associated with an abortion and that she understands those risks as they apply to her pregnancy. *See* 19 S.W.3d at 256. Second, she must show that she understands the alternatives to abortion and their implications. *See id.* at 256. Third, she must show that she is aware of the emotional and psychological aspects of undergoing an abortion. *See id.* at 256. We examine each of these factors in turn to determine whether Doe has established as a matter of law that she is "sufficiently well informed."

■ The trial court found that Doe has been "well apprised of the risks attendant to abortion and childbirth." Doe's testimony fully supports this finding. Doe testified that she had discussed the abortion procedure briefly with a doctor and in much more detail with a counselor. She related her understanding of the procedure in some detail and its attendant risks during and after the procedure. She expressed an understanding of post-operative precautions and requirements. Doe also testified that a nurse performed an ultrasound to determine fetal age and that she understood that the chance of complications from the procedure at this point in the pregnancy was not great but would increase as the pregnancy progressed. She testified to her understanding that it would still be legally possible to obtain an abortion after her eighteenth birthday, but stated that she would not undergo the procedure at that late date. From the foregoing we conclude, as the trial court did, that Doe obtained information from a health-care provider about the risks associated with an abortion and that she understood those risks.

■ The court of appeals held that Doe failed to satisfy the second *Doe 1(I)* factor, which requires the minor to show "that she understands the alternatives to abortion and their implications." 19 S.W.3d at 256. While the minor is not required to justify her decision, she must "be able to demonstrate that she has given thoughtful consideration to her alternatives, including adoption and keeping the child." *Id.* at 256. We also noted that the minor should be aware that if she keeps the child, the law requires the father to assist in the financial support of the child. *See id.* at 256 (citing TEX. FAM.CODE § 154.001).

The trial court found that Doe had not thoughtfully considered her alternatives because it concluded that she did not understand the intrinsic benefits of keeping the child or adoption, and the court of appeals agreed. Specifically, the trial court asked Doe what the benefits would be if she carried the baby to term. Doe responded that the benefit would be actually having the child, but she candidly admitted that she could not be sure what other benefits there might be since she is not a mother. Doe testified about the joy she experiences in working with children as a volunteer, and that she had taken a parenting class offered by her high school. She also testified that she had considered adoption, but did not feel that adoption was a realistic alternative because she could not give the child up after carrying her pregnancy to term. She further testified that she would worry that the baby would have an unsuitable environment or that the adoptive parents would not provide the proper love or care. The trial court found that Doe did not understand the benefits of keeping the child or putting the child up for adoption and denied the application.

When we wrote in *Doe 1(I)* that a minor must have considered the "benefits, risks, and consequences" of the various options, we did not intend to suggest that trial courts should create checklists that a minor must recite in order to establish that she has thoughtfully considered her options. 19 S.W.3d at 255. That a minor does not share the court's views about what the benefits of her alternatives might be does not mean that she has not thoughtfully considered her options or acquired sufficient information about them. It is, of course, beyond dispute that parenting or placing an infant for adoption can be deeply rewarding. The fundamental importance of the parent-child relationship in our society has long been recognized. *See Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). And, as the court of appeals observed, the adoption alternative may provide "positive and long lasting feelings of good will and selfless giving she might experience not only from giving life to the child and bringing it into the world, but also from giving a much wanted newborn to an adoptive family...." But *Doe 1(I)* does not require the minor to mechanically list or recite the potential benefits of her options. *See* 19 S.W.3d at 257. Instead, the focus of the inquiry is whether the minor has thoughtfully considered her alternatives, *see id.* at 256, and "the examining court must weigh her situation not against the ideal but against a standard of basic understanding of her situation, her choices, and her options." *In re Doe*, 19 Kan.App.2d 204, 866 P.2d 1069, 1074 (1994).

The concept of "benefits" is inherently subjective; what one person may consider a benefit, another may not. That Doe does not accept and pursue the alternate benefits to abortion does not mean that she has not given those alternatives thoughtful consideration. Moreover, even though there may be generally recognized benefits to an alternative, those benefits must be considered in light of the minor's particular situation. According to Doe's testimony, adoption was not a realistic option for her because she would grow emotionally attached to the child after birth and would be unwilling to give the child up. Doe's testimony shows that she does not perceive any benefits to carrying a baby to term in her current situation. The undeniable benefits of adoption the court of appeals identified are thus, to Doe, immaterial.

Doe's testimony demonstrates that she understands the alternatives to abortion as they apply to her and that she has thoughtfully considered their implications. Doe received information about her alternatives from several different sources. Before seeking information from organizations, Doe read books and did research on the Internet about her alternatives. She also visited an organization where she received additional oral and written information that advised her of her alternatives. While she did not recite in detail the information contained in the written materials, she testified that she had read and considered them. These materials discuss parenthood, adoption, abortion, and the benefits and drawbacks of each. One section on parenting discusses the difficulties of parenting, but states that a child could be a welcome addition to her family. The materials also state that the organization can provide information about pregnancy care, parenting skills, and sources of financial help for pregnant women. The section on adoption makes it clear that this, too, is a viable option. The materials note that there are more families interested in adopting than there are children to adopt so that the child would go to a family that really wants a child. The section on abortion explains the procedure and comments that some feel abortion is not moral while others claim it is more moral to have an abortion than an unwanted child. Doe also read other materials focusing on abortion that provided greater detail and answered questions about the procedure. Doe testified that she read through these materials several times.

Doe spoke for more than an hour and a half, on two different occasions, with one of the organization's counselors. The counselor told Doe what would happen if she decided to keep the child. Doe also had several conversations with a person who counsels pregnant teenagers and teenage mothers. Doe testified that, while both were supportive, neither urged abortion over carrying the child to term. Instead, they both wanted her to make her own decision.

In addition to speaking with people experienced in this area, Doe spoke with several people who had been in a similar situation. She spoke to a relative who had an abortion, a teenager who had an abortion, and two teenagers who did not have abortions and are now raising their children. Doe testified that the relative was happy with her decision, and the two teenagers who kept their children regretted their decisions because they were having difficulties as a result of having a child at a young age. The teenager who had an abortion talked to Doe about the procedure and about her thought processes in choosing to have an abortion. She told Doe that she is glad she had an abortion and does not regret it.

■ Doe did not seek information or counseling from anyone who would be against her having an abortion. JUSTICE HECHT argues in his dissent that her failure to do so supports the trial court's finding that she was not sufficiently well informed. But this Court held in *Doe 1(I)* that a minor is not required to seek information from any particular group or viewpoint so long as "she has obtained information on the relevant considerations from reliable sources of her choosing that enable her to make a thoughtful and informed decision." 19 S.W.3d at 257. Although JUSTICE HECHT may question whether *Doe 1(I)* was correctly decided, "there is no doubt that it is the law. The Court cannot simply pick and choose the cases in which the rule it has announced will apply." *Vickery v. Vickery,* 999 S.W.2d 342, 344 (Tex.1999) (HECHT, J. dissenting from denial of petition for review).

The record further reflects that Doe gave reasoned answers in response to questions about her options. When asked if she had thought about keeping the child, Doe explained that it would be very difficult for her considering her age and desire to further her education. She expressed her desire to go to college and have a career, and stated that she would like to be married and settled down before having a child. Doe testified that she did not believe herself ready for parenthood. She understood that the law requires the father to pay child support, but concluded that she and the father would not be able to support the child. She testified that the two teenagers who kept their babies, at least one of whom had married, led very hard lives and wished they could take it back.

■ As we have said, the courts' fundamental inquiry is whether the minor has thoughtfully considered her alternatives. This inquiry must focus not on whether the minor has recited a generally recognized list of benefits or consequences in order to justify her decision. Instead, the inquiry must take into account whether the minor has considered and weighed her alternatives in light of her particular circumstances. When a minor has established that she has engaged in a rational and informed decision-making process and concluded that realistic concerns foreclose her alternatives, she cannot be denied the statutory bypass for failing to list general benefits that others might see. It must be remembered that "it is not the court's responsibility to superimpose its judgment or its moral convictions on the minor in regard to what course of action she should take with reference to her own body." *Ex parte Anonymous,* 618 So.2d 722, 725 (Ala. 1993). The question is not whether she is making a decision that we would approve of or agree with, but whether she is sufficiently informed to make the decision on her own. *See id.*

 Doe also conclusively established that "she is . . . aware of the emotional and psychological aspects of undergoing an abortion." *In re Jane Doe 1(I)*, 19 S.W.3d at 256. Doe spoke to an older relative and another minor about their abortion decisions and how they felt about them. After this, Doe discussed the emotional effects of abortion with the organization's counselor, who also gave Doe written materials about the emotional consequences of abortion. Doe read these materials several times. Although she did not discuss the emotional consequences of abortion with anyone opposed to abortion, she was not required to do so. *See id.* at 257.

Doe testified that, after consulting these sources, she understood that many women experience guilt after an abortion and some women experience depression, but that abortion also provided many women with a feeling of relief. Doe did not merely consider these emotional consequences in the abstract; she carefully considered how each of these alternatives would affect her emotionally. She reasoned that all of her choices would involve guilt, but that she felt most comfortable with the decision to have an abortion.

Doe also indicated that she understood the gravity of her decision. She considered how abortion would affect her emotionally in light of its serious consequences. Doe asked to see the fetus on the ultrasound video, testifying that she considered it her responsibility to do so. Doe also testified that she understood and considered the fetus's development. Doe understood that her decision to terminate her pregnancy was irrevocable, and consequently recognized the seriousness of her decision. She also considered an abortion's effects on her spiritual well-being and concluded, based on her personal spiritual beliefs, that it would not have an adverse effect.

Doe also considered how her decision to have an abortion would affect her family relations. *See id.* She testified that it would likely cause problems within the family if her parents found out about her decision, and could possibly even lead her parents to abandon her. Doe based this conclusion on her parents' reaction to abortions by a relative and one of Doe's friends, as well as her parents' reactions to other events in Doe's past. Nevertheless, Doe believed that in the future she would be able to tell her parents about the abortion.

After considering all of these factors, Doe concluded that she felt comfortable with her decision and that she would not be burdened with guilt. While we might disagree with her conclusion, Doe conclusively established that it was "thoughtful and informed." *Id.*

In his dissent, JUSTICE HECHT cites the following evidence to support the trial court's finding that Doe was not sufficiently well informed: (1) "Doe admitted that she is young and inexperienced;" (2) "Doe has never had to make a decision approaching the seriousness of having an abortion;" and (3) Doe did not want to confront her parents about her decision because they would disapprove. But these considerations have no bearing on whether Doe was sufficiently well informed. While they might be relevant to Doe's maturity, the trial court's decision was not based upon maturity. Moreover, JUSTICE HECHT's focus on the minor's experience is misplaced. As the Alabama Supreme Court explains, "[i]n every case where a minor female is involved, we would not find the experience to be expected of an adult female. . . . [N]o minor female would be able to pass the experience test if adult-level experience were a criterion." *Ex parte Anonymous*, 618 So.2d at 725.

### III

#### Conclusion

For the foregoing reasons, we hold that Doe conclusively established the statutory requirements to obtain a judicial bypass. We therefore reverse the court of appeals'

judgment and render judgment granting Doe's application for a judicial bypass.

Justice ENOCH filed a concurring opinion, joined by Justice BAKER.

Justice GONZALES filed a concurring opinion, joined by Justice ENOCH.

Justice HECHT filed a dissenting opinion.

Justice OWEN filed a dissenting opinion.

Justice ABBOTT filed a dissenting opinion.

Justice ENOCH, joined by Justice BAKER, concurring.

I agree with the Court's opinion and JUSTICE GONZALES' additional concurrence. Therefore, I join both.

But I, also, must write separately to make another point. Long ago, I learned that the more my emotions influenced my decisions, the less I acted like a judge. A few years ago, JUSTICE HECHT was so passionate about an issue that he branded his colleagues as dishonest.[1] And it is obvious from his strident dissents in all four *Jane Doe* cases that JUSTICE HECHT has, once again, succumbed to passion. For he now brands his colleagues as "activists" and pro-abortionists.[2] He does this, not because there is truth to his charge, but simply because his passion overcomes reasoned discussion.

JUSTICE HECHT's attacks, although heated, are shallow. For example, he assails

the Court's decisions as "predetermined."[3] Yet it is he who has taken only one position—always deny. Further, he complains about the Court's workload and rushed decisions, implying that this activity was otherwise unanticipated.[4] Yet it was he who recommended the Court rules, which follow the legislative enactment, that require the lower courts to decide *Jane Doe* cases within two business days.[5] As well, he knew this Court would similarly expedite these cases, even in the absence of that time stricture. Finally, JUSTICE HECHT also excoriates the Court for its "judicial activism."[6] Apparently, because he mocks his colleagues' expression of their personal feelings about the issues in these cases, he believes that a judge is an activist if he or she *refuses* to succumb to those personal feelings.[7] Yet it is he who, *through his dissents, exemplifies the dangers present when a judge acts on passion.* I can only question how a judge's commitment to the principle of judicial restraint can mean anything if, whenever he feels strongly about an issue, he also feels free to translate his personal beliefs into a judicial decision. I cannot otherwise explain the foundation on which his opinion rests, for in five dissents, he has failed to cite to any case from any other state interpreting a similar statute, even though several such statutes have been in operation for fifteen years or more.

Because of this Court's continued concern for preserving confidentiality in these

---

**1.** *Maritime Overseas Corp. v. Ellis*, 977 S.W.2d 536, 537 (Tex.1996) (HECHT, J., dissenting from denial of application for writ of error)(colleagues' votes "would have been different had they been public.").

**2.** *In re Jane Doe 4 (Doe 4(I) )*, 19 S.W.3d 322 (Tex.2000)(HECHT, J. dissenting).

**3.** *Id.* at 373(HECHT, J., dissenting).

**4.** *See In re Jane Doe 2 (Doe 2)*, 19 S.W.3d 278, 291 (Tex.2000) (HECHT, J., dissenting); *In re*

*Jane Doe 3 (Doe 3)*, 19 S.W.3d 300, 310–11 (Tex.2000) (HECHT, J., dissenting); *Doe 4(I)*, 19 S.W.3d at 330 (HECHT, J., dissenting).

**5.** TEXAS PARENTAL NOTIFICATION RULES AND FORMS, Rules 2.5(d) and 3.3(c).

**6.** *See, e.g., Doe 4(I)*, 19 S.W.3d at 328 (HECHT, J., dissenting).

**7.** *See* 19 S.W.3d at 328.

matters,[8] I must also challenge JUSTICE HECHT on his routine practice of revealing to the public "in complete detail" the minors' testimony in these cases.[9] The hearings in these cases are to be confidential— a requirement this Court's rules recognize, which JUSTICE HECHT himself voted for in more dispassionate days.[10] Yet now he violates that rule, for no apparent jurisprudential purpose. What is more, his disclosures leave the Court in an untenable position. The Court cannot respond because to do so would require it to reveal whatever other pieces of the record remain confidential.

As an example, I note his writings in the Jane Doe 4 cases. In Jane Doe 4's first appeal, JUSTICE HECHT disclosed that the minor in *In re Jane Doe 3* [11] spoke to her mother about her situation instead of pursuing her case on remand.[12] But to what issue in *In re Jane Doe 4* was the information about Jane Doe 3 relevant? None. Furthermore, the issue in Jane Doe 3's case was never whether she would tell her mother. The question was what would happen when her mother told her father and her father became intoxicated.[13] As to *that* part of the story, the Court doesn't yet know the ending and, because the proceedings are confidential, the Court wouldn't reveal it in any event. Markedly, JUSTICE HECHT agreed with the Court's decision on Jane Doe 4's second appeal.

But he, once again, wrote separately to publish chapter and verse the minor's confidential testimony.[14] It would appear that JUSTICE HECHT intends nothing more than to punish, as best he personally can, minors for seeking a judicial bypass. Although the law promises them confidentiality, he promises them notoriety.

Finally, I end by recalling that JUSTICE HECHT began his attack on his colleagues in the very first *Jane Doe* case. Without any factual basis, he launched two rhetorical broadsides, broadsides that he used to establish the themes for his dissents. Those broadsides are that this Court's standard is so low that it is no standard at all, and that our standard opens the flood gates for judicial bypasses.[15] Today he reiterates his theme that the Court construes the Parental Notification Act "as liberally allowing minors to have abortions without involving their parents...."[16] But while to say a thing loud enough and long enough may convince some people to believe it, that does not make it true. And neither of his broadsides have proven to be true.

Several months have passed since JUSTICE HECHT's first attack and to date only four Jane Does have come before this Court. In this case, *Jane Doe 1*, the matter was remanded with instructions for trial courts on how to evaluate whether a minor is mature and sufficiently well in-

---

8. See, e.g., Doe 3, 19 S.W.3d at 305; Doe 4(I), 19 S.W.3d at 323.

9. See, e.g., In re Jane Doe (Doe 1(I)), 19 S.W.3d 249, 276 (Tex.2000)(HECHT, J., dissenting).

10. Compare TEXAS PARENTAL NOTIFICATION RULES AND FORMS, Rules 1.3 and 1.4. *with Doe 1(I)*, 19 S.W.3d at 277 (HECHT, J., dissenting), Doe 2, 19 S.W.3d at 290–91 (HECHT, J., dissenting), Doe 3, 19 S.W.3d at 309 (HECHT, J., dissenting), and Doe 4(I), 19 S.W.3d at 327 (HECHT, J., dissenting).

11. 19 S.W.3d 300 (Tex.2000).

12. See Doe 4(I), 19 S.W.3d at 327–28 (HECHT, J., dissenting).

13. See Doe 3, 19 S.W.3d at 312.

14. See In re Jane Doe 4 (Doe 4(II)), 19 S.W.3d 337 (Tex.2000)(HECHT, J., concurring).

15. See, e.g., Doe 1(I), 19 S.W.3d at 276 (HECHT, J., dissenting); Doe 2, 19 S.W.3d at 298 (HECHT, J., dissenting); Doe 3, 19 S.W.3d at 309 (HECHT, J., dissenting); Doe 4(I), 19 S.W.3d at 327–28) (HECHT, J., dissenting).

16. See 19 S.W.3d at 368.

formed. On return, the Court granted Jane Doe 1 a judicial bypass. Her second hearing, as the Court observes, lasted for hours and required her to testify in great detail.

The Court remanded Jane Doe 2's case with instructions for trial courts on how to evaluate the best interest and abuse prongs of the judicial bypass.[17] Jane Doe 2 has not returned to this Court. I caution that we do not know whether the trial court on remand granted the bypass or whether Jane Doe 2 dropped her application.

But dropping her application is exactly what happened for Jane Doe 3, whose initial hearing occurred before the Court issued its instructions in *Doe 1* and *Doe 2*, and whose case was remanded in light of those instructions.[18] Rather than continue with the effort to meet the standard for a judicial bypass that this Court actually requires, Jane Doe 3 notified a parent.

As for Jane Doe 4, whose case was also remanded to allow her to have a hearing according to the Court's instructions, she returned to this Court but was denied a judicial bypass.[19] Like Jane Doe 1, her second hearing was lengthy and her testimony was detailed.

From the beginning, JUSTICE HECHT's charges were unsupported by any facts. Here in the middle, the facts are that the *Jane Doe* cases have appeared as the Legislature expected and the Court has disposed of them in the manner the Legislature expected. As for cases coming in a "flood," they appear only to have come in the expected spurt. In the end, JUSTICE

HECHT's explosive rhetoric will not have advanced the jurisprudential debate about the proper application of the Parental Notification Act. Instead, his intemperance has pushed political and social hot buttons that have discomfited citizens of this State and their elected officials, needlessly, with no opportunity to assess whether the Parental Notification Act was having its desired effect.[20]

Now based on the facts that only time could reveal, it is plain that the statute, including the Court's interpretation, is having its intended effect. Although the state cannot prohibit minors from obtaining an abortion, it can and has created a rule of law sufficiently impressing upon minors the seriousness of the abortion decision and that the State wants parents to be informed. From what the Court now knows, I venture an educated guess that what happened in the case of Jane Doe 3 is, in all probability, now the rule in Texas. Once a minor becomes aware of what she must go through to obtain a judicial bypass, she will choose for herself to involve her parents.

When influenced by emotions, a judge loses the judicial perspective, often overstating the case, and at times, resorting to writing that is unbecoming. My colleague's writings in these cases have been inappropriate. Deep convictions do not excuse a judge from respecting his colleagues, the litigants, or the law.

Justice GONZALES, joined by Justice ENOCH, concurring.

I fully join in the Court's judgment and opinion. I agree that there is no evidence

---

17. *See Doe 2*, 19 S.W.3d at 284.

18. *See Doe 3*, 19 S.W.3d at 300.

19. *See Doe 4(I)*, 19 S.W.3d at 327; *Doe 4(II)*, 19 S.W.3d at 340.

20. Clay Robison, *Justice Blasts Colleagues on Texas Abortion Law*, HOUSTON CHRONICLE, March 23, 2000 at A1; Bruce Hight, *High Court Bypassing Intent of Abortion Law, Senator Says*, AUSTIN AMERICAN-STATESMAN, March 24, 2000 at B1; Mary Alice Robbins, *Court's*

*Notification Standard Too Low, State Lawmaker Says*, AMARILLO DAILY NEWS, March 24, 2000 at 1A; Christy Hoppe, *Abortion Again Fractures Court*, DALLAS MORNING NEWS, March 23, 2000 at A1; Mary Flood, *Law Creates Confusion on Abortion*, WALL STREET JOURNAL, March 22, 2000 at T1; Bruce Hight, *Abortion Cases Generate Friction on High Court*, AUSTIN AMERICAN-STATESMAN, March 19, 2000 at A1; Connie Mabin, *Family Bypassed as Court Allows Abortion*, FORT WORTH STAR-TELEGRAM, March 11, 2000 at 1A.

supporting the trial court's finding that Jane Doe was not sufficiently well informed. And I agree that the contrary position is established as a matter of law.

Only in this, an appeal after remand of the first of four *Jane Doe* cases, has the Court granted a minor's application to bypass notifying her parents before she consents to an abortion.[1] Yet in each case, the Court has struggled to render the correct decision, and some members of the Court have strongly disagreed. The tenor of the opinions have been unmistakably contentious. It has been suggested that the Court's decisions are motivated by personal ideology. *See* 19 S.W.3d 367 (HECHT, J., dissenting). To the contrary, every member of this Court agrees that the duty of a judge is to follow the law as written by the Legislature.[2] This case is no different. The Court's decision is based on the language of the Parental Notification Act as written by the Legislature and on established rules of construction. Any suggestion that something else is going on is simply wrong.

Legislative intent is the polestar of statutory construction. *See City of LaPorte v. Barfield,* 898 S.W.2d 288, 292 (Tex.1995). Our role as judges requires that we put aside our own personal views of what we might like to see enacted, and instead do our best to discern what the Legislature actually intended. *See Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865–66 (Tex.1999). We take the words of the statute as the surest guide to legislative intent. *See id.* at 866.

Once we discern the Legislature's intent we must put it into effect, even if we ourselves might have made different policy choices. *See id.*

The starting point for understanding the Parental Notification Act is its provision that a medical professional may not perform an abortion on a minor without first notifying one of the parents. *See* TEX. FAM.CODE § 33.003(a). The policy decision here is clear—to protect parents' rights to involve themselves in their daughters' decisions and to encourage that involvement. But that is only the starting point. The Legislature did not make this parental right absolute. Instead, the Legislature created three exceptions, allowing a minor to avoid notifying her parents if she can show: (1) she is mature and sufficiently well informed to make the decision to have an abortion performed without notification of either parent, (2) notification of the parents would not be in the minor's best interest, or (3) notification of the parents may lead to physical, sexual, or emotional abuse of the minor. *See* TEX. FAM.CODE § 33.003(i).

The dissenting opinions suggest that the exceptions to the general rule of notification should be very rare and require a high standard of proof. I respectfully submit that these are policy decisions for the Legislature. And I find nothing in this statute to directly show that the Legislature intended such a narrow construction. As the Court demonstrates, the Legislature certainly could have written section 33.033(i) to make it harder to bypass a

---

**1.** *See In re Jane Doe,* 19 S.W.3d 249 (Tex. 2000)(*Doe 1(I)*); *In re Jane Doe 2,* 19 S.W.3d 278 (Tex.2000); *In re Jane Doe 3,* 19 S.W.3d 300 (Tex.2000); *In re Jane Doe 4,* 19 S.W.3d 322 (Tex.2000), *appeal after remand, In re Jane Doe 4,* 19 S.W.3d 337 (Tex.2000).

**2.** *See National Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525 (Tex.2000)(BAKER, J.); *Quick v. City of Austin,* 7 S.W.3d 109, 135–36 (Tex.1999)(HANKINSON, J., dissenting); *Fleming Foods of Texas Inc. v. Rylander,* 6 S.W.3d 278, 284 (Tex.1999)(OWEN, J.); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 866 (Tex.1999)(GONZALES, J.); *Phillips v. Beaber,* 995 S.W.2d 655, 658 (Tex. 1999)(O'NEILL, J.); *In re Bay Area Citizens Against Lawsuit Abuse,* 982 S.W.2d 371, 380 (Tex.1998)(ABBOTT, J.); *Abbott Lab., Inc. v. Segura,* 907 S.W.2d 503, 512 (Tex.1995)(PHILLIPS, C.J.); *City of LaPorte v. Barfield,* 898 S.W.2d 288, 292 (Tex.1995)(HECHT, J.); *Bridgestone/Firestone, Inc. v. Glyn–Jones,* 878 S.W.2d 132, 135 (Tex.1994)(ENOCH, J., dissenting).

parent's right to be involved in decisions affecting their daughters. *See* 19 S.W.3d at 350. But it did not. Likewise, parts of the statute's legislative history directly contradict the suggestion that the Legislature intended bypasses to be very rare. *See id.* at 352 (detailing legislative history). Thus, to construe the Parental Notification *Act so narrowly as to eliminate bypasses, or to create hurdles that simply are not to be found in the words of the statute, would be an unconscionable act of judicial activism.* As a judge, I hold the rights of parents to protect and guide the education, safety, health, and development of their children as one of the most important rights in our society. But I cannot rewrite the statute to make parental rights absolute, or virtually absolute, particularly when, as here, the Legislature has elected not to do so. The Court said in *Doe 1(I)* that a minor must make at least three showings before she may exercise the bypass rights the Legislature gave "mature and sufficiently well informed" minors under section 33.003(i). *In re Doe 1(I)*, 19 S.W.3d 249 (Tex.2000). These showings are to ensure that the minor can demonstrate the level of maturity and knowledge the Legislature seems to have intended when it passed a statute that primarily protects parental rights, but also confers judicial bypass rights to certain minors. Based on the evidence of Doe's maturity and knowledge, I conclude the limitations upon parental rights in section 33.003(i) apply here. Therefore, I am compelled to grant Doe's application.

It is important to appreciate that the Legislature adopted a statutory scheme that subordinates parental rights in the case of a mature and sufficiently well informed minor, even if the minor has an ideal relationship with her parents, and even if notifying the parents would not only not place the minor in emotional or physical danger, but may in fact be in her best interest. While the ramifications of such a law and the results of the Court's decision here may be personally troubling to me as a parent, it is my obligation as a judge to impartially apply the laws of this state without imposing my moral view on the decisions of the Legislature. JUSTICE HECHT charges that our decision demonstrates the Court's determination to construe the Parental Notification Act as the Court believes the Act should be construed and not as the Legislature intended. *See* 19 S.W.3d at 373–74 (HECHT, J., dissenting). I respectfully disagree. This decision demonstrates the Court's determination to see to it that we discharge our responsibilities as judges, and that personal ideology is subordinated to the public will that is reflected in the words of the Parental Notification Act, including the provisions allowing a judicial bypass.

Because the majority opinion correctly applies the Act as written to the facts in this record, I concur.

## Justice HECHT, dissenting.

Often a court construing a statute wishes that it had more information about what the Legislature intended. Since issuing its first opinions construing the Parental Notification Act,[1] this Court has received extraordinary assistance from Members of the Legislature in reviewing the history of the statute. The Senate and House sponsors of the legislation, together with eight other senators and forty-six other representatives, have informed the Court as amici curiae that its construction of the statute to date is incorrect, and they have provided citations to the hearings and debates on the statute to support their view. While the Court is certainly not bound by the post-enactment views of legislators, the Court is wrong to simply dismiss the parts of the legislative record that these legislators have cited in support of

---

1. *In re Doe 1,* 19 S.W.3d 249 (Tex.2000); *In re Doe 2,* 19 S.W.3d 278 (Tex.2000); *In re Doe 3,* 19 S.W.3d 300 (Tex.2000); *In re Doe 4,* 19 S.W.3d 322 (Tex.2000); *In re Doe 4(II),* 19 S.W.3d 337 (Tex.2000).

their position. Relying instead on a few minor, isolated comments it can find in the legislative history to support its own view, and disregarding significant portions of that record to the contrary, the Court dares the Legislature: If we have not got the statute's meaning right, then amend it. "This," says the Court, "is precisely how the separation of powers doctrine should work."[2]

I disagree. The Court's utter disregard for the legislative history cited by fifty-six legislators in support of their view of the Parental Notification Act is an insult to those legislators personally, to the office they hold, and to the separation of powers between the two branches of the government. I cannot conceive of another context in which the Court would pay so little heed to legislators' statements concerning the meaning of a statute. The Court adamantly refuses to listen to all reason, and the only plausible explanation is that the JUSTICES who comprise the majority—CHIEF JUSTICE PHILLIPS, JUSTICE ENOCH, JUSTICE BAKER, JUSTICE HANKINSON, JUSTICE O'NEILL, and JUSTICE GONZALES—have resolved to impair the Legislature's purposes in passing the Parental Notification Act, which were to reduce teenage abortions and increase parental involvement in their children's decisions.

The Court is well aware of the near-universal criticism of its construction of the Parental Notification Act, and the defensiveness of the majority and concurring opinions is striking. I cannot recall ever having seen a court or its members so abject in apologizing for their decision or so profuse in proclaiming their own integrity as this Court is today. Launching its opinion with a discourse on "The Proper Role of Judges", the Court makes this extraordinary statement:

> In deciding this case we squarely confront the question of whether, as judges, we should apply the Parental Notification Act as it is written by the Legislature or according to our own personal beliefs.[3]

This appears to be a hard question for the JUSTICES who comprise the majority. One wonders what the Court has done previously when it only *obliquely* confronted the question of whether it should do its duty. But at least these JUSTICES are able to confirm that they have reached the right answer:

> In reaching the decision to grant Jane Doe's application [to have an abortion without notice to either of her parents], we have put aside our personal viewpoints and endeavored to do our job as judges—that is, to interpret and apply the Legislature's will as it has been expressed in the statute.[4]

Still, they say, laying aside personal views has been terribly hard to do. In a section of the opinion bearing the remarkable label, "Respecting the Rule of Law", the JUSTICES who join the Court's opinion confess:

> We might personally prefer, as citizens and parents, that a minor honor her parents' right to be involved in such a profound decision. But the Legislature has said that Doe may consent to an abortion without notifying her parents if she demonstrates that she is mature and sufficiently well informed.[5]

After struggling with themselves, say the JUSTICES in the majority, they have decided in the end to follow the rule of law:

> As judges, we cannot ignore the statute or the record before us. Whatever our personal feeling may be, we must "respect the rule of law."[6]

To this JUSTICE GONZALES adds his personal testimony:

2. *Ante* at 354.

3. *Ante* at 350.

4. *Ante* at 350.

5. *Ante* at 356.

6. *Ante* at 356.

While the ramifications of [the Parental Notification Act] and the results of the Court's decision here may be personally troubling to me as a parent, it is my *obligation as a judge to impartially apply* the laws of this state without imposing my moral views on the decisions of the Legislature.[7]

We are not judicial activists, say the JUSTICES in today's majority. Surely they know that remonstrances like these do not allay doubts but only exacerbate them. "The lady doth protest too much, methinks." [8] The Court has construed scores of statutes without seeing any need to provide the reassurances with which today's opinion is slathered. In all those other cases the Court sought to demonstrate its fidelity to legislative intent and purpose by the strength and integrity of its analysis, not by empty rhetoric. If the Court's usual practice is to respect the rule of law without having to say so, why does it have to say so today, repeatedly, unless the Court senses itself that its deeply flawed statutory analysis makes resort to rhetoric essential?

Three aspects of the Court's opinion belie its rhetoric. First, the Court claims to have announced its ruling without opinion, contrary to its usual practice, "on the concern that Doe be able to undergo a less risky abortion procedure, if that option was still available to her and that was her decision." [9] In fact, Doe had finished her fourteenth week of pregnancy at the time the Court ruled, and nothing in the record suggests that any delay, let alone a few days, would have impaired her in any way. Moreover, if the Court was concerned as it now says, it showed none of the same concern in the appeal in *In re Doe 4,* which was filed the day before this appeal, and in which the Court waited fifteen days to rule, with opinion. Second, as I have already noted, the Court mostly ignores an extraordinary amicus brief filed on behalf of the two legislative sponsors of the Parental Notification Act and fifty-four other legislators, which not only states their view of the statute's history and purpose but cites extensively to the legislative record. Finally, the Court persists in its. view of the Act as liberally allowing minors to have abortions without involving their parents against the solid and overwhelming reality that the statute's supporters and opponents all shared the same view—that the statute would make it harder for minors to obtain abortions without notifying a parent.

If the Court were construing any other statute, it would by now have conceded that it was wrong. Logic, law, and legislative history cited by the legislators themselves all argue against the Court's construction of the Parental Notification Act. Why would six JUSTICES on this Court ignore fifty-six legislators if they were trying to follow the law rather than their own personal views? This is not merely a rhetorical question; if the Court has an answer, it should give it. Its refusal to do so is answer enough. Because the Court continues to misconstrue the Parental Notification Act and misapplies it in this case, I dissent.

## I

The Court's haste in deciding this case on the merits without issuing an opinion explaining its decision is unjustified. The Court's deviation from its usual procedures demonstrates again its determination to see to it that minors' applications for abortions without parental notification are quickly and summarily granted.

Doe filed her notice of appeal to this Court on March 8, and we received the record by fax late that evening. The Court granted the application by order without opinion late on the afternoon of

---

7. *Ante* at 366 (Gonzales, J., concurring).

8. WILLIAM SHAKESPEARE, HAMLET act 3, sc. 2.

9. *Ante* at 349.

March 10.[10] Four JUSTICES dissented from the issuance of a decision on the merits without an accompanying opinion.[11] The Court now explains its haste as follows:

> the record indicated both that Doe was entitled to a bypass and out of concern that any further delay might expose her to greater risk. . . . We issued our order on the concern that Doe be able to undergo the less risky suction curettage procedure, if that option was still available to her and that was her decision. While the stage of Doe's pregnancy at the time of the hearing and her doctor's general policies about the procedure are in the record, the exact date that Doe would no longer be eligible for the safer procedure is not. Any significant delay would have guaranteed that Doe could not have the safer procedure.[12]

Doe testified in the trial court at her first hearing on February 10 that she had first learned she was pregnant eight-and-one-half weeks (i.e., 59.5 days) earlier. She testified at the hearing on remand on February 29 that an ultrasound exam on February 19 showed that she had been pregnant eleven weeks and one day (78 days). Assuming that she learned she was pregnant about ten days after she actually became pregnant, her testimony was consistent with the results of the ultrasound exam. Thus, according to the record, Doe had been pregnant for fourteen full weeks (98 days) on March 10.

If, as the Court believed, the safest procedures could be used only "until the fourteenth week", or even "up to the fifteenth week",[13] they were no longer available to Doe, who finished her fourteenth week of pregnancy the day the Court issued its decision, was already in her second trimester, and was in her fifteenth week of pregnancy the day after the Court ruled. The Court's explanation for hurrying the process is thus nonsense: "we needed to rule when we did so that Doe could take advantage of medical procedures no longer available to her." This is what passes for careful consideration in the Court's parental notification cases. The Court can point to nothing in the record to indicate that if the Court had taken ten days to issue an opinion, as it did when Doe first appealed,[14] or six days, as it did in *In re Doe 2*,[15] that Doe would have been adversely harmed in any way. On the contrary, Doe had just requested and received a seven-day continuance in the court of appeals immediately before she appealed to this Court.

Moreover, if concern that Doe 1 be able to have a less risky procedure was what prompted the Court to hasten its decision in her case, it showed none of the same concern for Doe 4, who had filed her appeal the day before Doe 1 did.[16] The Court waited fifteen days to rule in Doe 4's case, until she was nearly twelve weeks' pregnant, then remanded her to the trial court to start over. When she returned to this Court eight days later, and then thirteen weeks' pregnant, the Court waited twelve days to deny her appeal,[17] thus denying her any access to a "less risky" abortion, even by the Court's shaky medical reckoning. Had the Court ruled sooner, Doe 4 could have notified her parents and obtained an abortion in her first trimester. But the Court was not concerned for Doe 1 and unconcerned for Doe 4; the truth is that in its haste to grant Doe 1's application, the Court simply had no time to review the record and see that a delay of a few days to issue a reasoned decision

10. 19 S.W.3d 300 (2000) (Phillips, C.J., and Hecht, Owen, and Abbott, JJ., dissenting).

11. *Id.*

12. *Ante* at 354.

13. *Ante* at 354.

14. *In re Doe 1(I)*, 19 S.W.3d 249 (Tex.2000).

15. 19 S.W.3d 278 (2000).

16. *In re Doe 4(I)*, 19 S.W.3d 322 (Tex.2000).

17. *In re Doe 4(II)*, 19 S.W.3d 337 (Tex.2000).

would not impair her in any way. Indeed, as I have noted, Doe herself had just requested a seven-day postponement in the court of appeals—not the action of someone pressed for time. Now that the Court can see that the delay in issuing an opinion would not have mattered to Doe 1 in any way, the Court must concoct a new, and regrettably misleading, explanation for its haste. That the JUSTICES in the majority are willing to shade the truth, even about the procedures followed, illustrates their personal investment in outcomes, not an adherence to the rule of law.

The Court says that it was concerned that "any additional delay might call into question whether the proceedings were sufficiently expeditious to pass constitutional muster",[18] but it is hard to find much basis for any such concern when Doe had herself delayed the proceedings a total of eight days. The Court cites *Ohio v. Akron Center for Reproductive Health* [19] and *Bellotti v. Baird*,[20] but neither case supports the Court's supposed concern for expedition. In *Bellotti*, the Supreme Court required only "sufficient expedition to provide an effective opportunity for an abortion to be obtained",[21] and Doe has not even questioned whether such opportunity was available to her. In *Akron*, the Supreme Court held that a process that could last up to twenty-days was not unconstitutional on its face, and that it had previously upheld a bypass procedure "that could require 17 calendar days plus a sufficient time for deliberation and decisionmaking at both the trial and appellate levels." [22] If the Court had waited until March 13 to rule and had issued an opinion at that time, no serious argument could be made

that the bypass procedure had denied Doe "an effective opportunity for an abortion".

The Court notes that Rule 4.3 of the Parental Notification Rules requires it to rule "as soon as possible", and that Doe's notice of appeal "specifically stated," in large, bold-faced type: "PLEASE EXPEDITE." [23] Actually, the request is directed to the clerk: the notice of appeal states, "ATTENTION CLERK: PLEASE EXPEDITE", as prescribed by the standard form for such notices.[24] Doe's first notice of appeal to this Court bore the same inscription, and the Court took ten days to rule. The notices of appeal in all the other parental notification cases in this Court have been on the identical form, and the Court has taken fifteen days to rule once, twelve days on two occasions, and six days on another. In every other case the Court accompanied its decision with an opinion. In *In re Doe 4*,[25] the Court took fifteen days to rule, even though it left the minor at the beginning of her thirteenth week of pregnancy and only a week short of the different procedure and increased risk that the Court claims to have been trying to avoid in this case. The Court cannot explain why it had to hurry in this case but could take its time in *Doe 4*.

The Court notes that it is prohibited from "disclosing the substance or course of our deliberations", then proceeds to violate that prohibition by asserting that "any suggestion that we issued our March 10th order without a majority consensus on the merits is incorrect because a majority consensus was necessary to issue the order." [26] In other words, the Court states not just that a majority of the Court had agreed to grant the application, which is of course obvious from the issuance of the

---

**18.** *Ante* at 355.

**19.** 497 U.S. 502, 513, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990).

**20.** 443 U.S. 622, 644, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).

**21.** *Id.*

**22.** 497 U.S. at 514, 110 S.Ct. 2972.

**23.** *Ante* at 355.

**24.** Forms 3A and 4A, PARENTAL NOTIFICATION R.

**25.** 19 S.W.3d 322 (Tex.2000).

**26.** *Ante* at 355.

order, but that there was a majority consensus *on the merits* and basis for decision before the order issued. The implication that the Court gave anything approaching reasoned deliberation to this case before it granted Doe's application is false, nor could it have done so, given the haste with which the Court acted. If the Court can recite the events that led to its ruling and demonstrate that it gave careful consideration to this case before it reached a decision, then it should do so, rather than hide behind the confidentiality of our deliberations.

Finally, the Court cites five instances when it has announced its judgment without opinion. None supports its action in the present case.

In the first, *Republican Party v. Dietz*,[27] the trial court had issued a temporary injunction prohibiting the Republican Party of Texas from denying the Log Cabin Republicans an exhibit booth at the two-day state convention which was to convene six days later. The Party filed its petition for mandamus and motion for an emergency stay in this Court on the next business day after the injunction issued, and we heard oral argument two days later, the day before the convention began. It is true, as the Court states, that "we granted a stay with an opinion to follow that provided the Party all the relief it was entitled to."[28] But we did so after briefing and oral argument and without dissent. We also issued an opinion with the stay order explaining our reasons and the basis for the stay.[29] The Court does not bother to cite that opinion. Whether we had granted the stay or not, the case would have been moot the day after oral argument.

The second case the Court cites is *Texas Water Commission v. Dellana*.[30] There,

the Water Commission had denied an application by Hunter Industrial Services, and Hunter petitioned in the district court for approval to take the depositions of nine Commission staff members to obtain evidence for use in Hunter's motion for rehearing due in two weeks. One week before Hunter's motion was due, the district court ordered that the depositions be taken within three days, and the Commission immediately petitioned the court of appeals and then this Court for mandamus relief. The day before the deadline for the depositions we granted the Commission's motion for an emergency stay of the trial court's order and requested that Hunter respond to the Commission's mandamus petition. After reviewing Hunter's response, on the day before its motion for rehearing was due, we directed the trial court to set aside its order. Even though as a practical matter we granted the Commission no more relief than our stay afforded, we issued our judgment without opinion so as not to delay Hunter in filing its motion for rehearing. No JUSTICE dissented. As in *Dietz*, whether we had granted relief or not, the case would have been almost immediately mooted.

In the third case the Court cites, *Davenport v. Garcia*,[31] the district court had enjoined the participants from discussing the case with outsiders. Petitioner sought relief in this Court by mandamus, and we heard oral argument.[32] More than four months later, before the Court's opinions were completed, we granted petitioner's motion for an emergency stay of the district court's order without opinion.[33] We expressly noted that other issues remained under consideration. The Court's decision was unanimous.

Thus: In *Dietz*, we issued an opinion with our ruling, albeit a preliminary one;

**27.** 940 S.W.2d 86, 94 (Tex.1997).

**28.** *Ante,* at 355.

**29.** 924 S.W.2d 932 (Tex.1996) (per curiam).

**30.** 849 S.W.2d 808 (Tex.1993) (per curiam).

**31.** 834 S.W.2d 4 (Tex.1992).

**32.** 35 Tex. Sup.Ct. J. 170 (cause submitted Dec. 3, 1991).

**33.** 837 S.W.2d 73 (Tex.1992).

in the *present case* we issued no opinion at all. In *Dietz* and *Davenport*, we issued a ruling only after oral argument; in the present case there was no argument. In *Davenport* we did not grant final relief; here we did. In *Dietz* and *Dellana* the controversy would have been mooted within a day or so whether the Court had acted or not; in the present case, there was no indication that the minor's circumstances were about to change in any way. In all three of the cases cited, a party requested an emergency ruling; here, no one did. In none of these cases did any JUSTICE dissent from the procedure.

The other two cases the Court cites,[34] and three cases it does not cite,[35] were all election cases, and the two most recent were nearly ten years ago. Lately, in election cases, rather than issue a judgment without an opinion, we have directed that the printing of ballots be delayed so that an opinion can be completed.[36]

In sum, the Court's action in the present case has no precedent except in election cases ten years old and older. More recently, the Court has refused to issue judgment without an opinion even in election cases. The Court's inability to explain its hasty departure from well-established procedures over the dissents of four JUSTICES casts doubt on its assertion that it is merely following the law and that it has no personal predilections in these cases.

## II

The Court states that "Senate Bill 30's author and sponsor have filed an amicus brief, joined by other legislators...."[37] Nine senators and forty-seven representatives joined in the brief. I do not recall another case in which the Court received an amicus brief on behalf of so many legislators attempting to assist the Court in analyzing the legislative history of a statute, yet the Court dismisses the amici as being less than a third of the Members of the Legislature.

The Court notes that "'courts construing statutory language should give little weight to post-enactment statements by legislators,'" citing my concurring and dissenting opinion in *C & H Nationwide, Inc. v. Thompson*.[38] I am heartened that the Court has come round to my viewpoint, even if its motive is to contrive some reason to ignore what fifty-six legislators think they just passed in the last session. But the Court's about-face on this issue of statutory construction provides no excuse for *ignoring the record cited by the legislators*. In other words, even if it is dangerous to put too much stock in post-enactment statements about what was intended, citations to the legislative history showing what was said and done during passage of the bill cannot be discounted merely because the information is provided by legislators. If anything, the Court ought to be grateful to amici for helping to summarize the voluminous legislative record.

While issuance of our opinions in this case has been pending, the Court has obtained the materials reflecting the hearings and debates on the Parental Notification Act during the last session. Most of these materials are audiotapes, and the Court has had them transcribed at its own expense. Having had ample opportunity to review all these materials and check the citations provided us by amici, the Court does not criticize these citations; it simply disagrees with the conclusions to be

---

**34.** *Painter v. Shaner*, 667 S.W.2d 123, 124 (Tex.1984); *Coalson v. City Council of Victoria*, 610 S.W.2d 744, 747 (Tex.1980).

**35.** *Correa v. First Court of Appeals*, 795 S.W.2d 704, 705 (Tex.1990); *Brown v. Meyer*, 787 S.W.2d 42, 43 (Tex.1990); *State Democratic Executive Comm. v. Rains*, 758 S.W.2d 227, 228 (Tex.1988).

**36.** *Davis v. Taylor*, 930 S.W.2d 581, 582 (Tex. 1996); *Bird v. Rothstein*, 930 S.W.2d 586, 587 (Tex.1996).

**37.** *Ante* at 352.

**38.** 903 S.W.2d 315, 328–329 (Tex.1994) (Hecht, J., concurring and dissenting).

drawn. That, of course, is the Court's prerogative, but while the Court may disagree with these arguments, is not entitled to ignore them.

The Court cites to the legislative record eight times. Three citations have nothing to do with any issue in dispute. Of the other five, the Court says that two show that there was some anticipation that judicial bypass applications would be rare,[39] and two show that most applications in Nebraska are granted.[40] The Court cites one supporter of the statute who said in a floor debate that "obtaining a bypass in not going to be a problem."[41] Based on nothing other than these snippets of the record, and contrary to the bill's fiscal note that anticipated that half the applications would be denied, the Court concludes that "a number of statements by the bill's authors, sponsors, and sponsors of companion legislation, including some of the amici, strongly suggest that the Legislature did not contemplate a strenuous statutory burden for the minor."[42] Even if this were a fair summation, and it certainly is not—by "a number of statements" the Court means *three*, two of them about Nebraska—the Court simply ignores contrary statements in the record. For example, the amici note that Senator Bernsen referred to cases suitable for bypass procedure as "small exceptions";[43] Representative Delisi said that it was "certainly right" that judges would have to grant bypasses only "in rare cases when it is not appropriate to tell the girl's parents";[44] Representative Gray referred to bypass cases as "exceptional";[45] and Representative King stated that parental involvement would be required in the "vast, vast, vast majority of cases".[46]

That the legislative history contains statements like those to which the amici point should come as no surprise. If the Legislature really thought what the Court says it did—that virtually every minor's application should be granted—then why did it bother to pass the statute, and why did it agonize so in the process? If there is one thing that may be said with certainty concerning the parental notification legislation, it is that every participant in the long, difficult, and emotional process thought that the statute would have significant consequences. This was not a bill making technical corrections to part seven of the Uniform Commercial Code; this was a major piece of legislation that this Court has neutered.

It is extremely unfair for the Court to single out phrases and comments by supporters and sponsors of the legislation, as if to embarrass them with apparent inconsistencies, while ignoring the multitude of statements that support their view of the intent of the legislation. I cannot conceive that most MEMBERS of today's majority would ever show such thorough disdain for the expressions of legislative will and purpose in any other context. I do not know what plausible conclusion can be drawn other than that the JUSTICES in the majority are determined to construe the Parental Notification Act as they personally believe it *should* be construed and not as the Legislature intended.

---

39. *Ante* at 352.

40. *Ante* at 353.

41. *Ante* at 353.

42. *Ante* at 353.

43. *Hearings on S.B. 30 Before the Senate Human Services Comm.,* 76th Leg., R.S., tape 3, at 4 (Mar. 10, 1999).

44. *Hearings on S.B. 30 Before the House State Affairs Comm.,* 76th Leg., R.S., tape 1, side A (Apr. 19, 1999).

45. *Hearings on S.B. 30 Before the House State Affairs Comm.,* 76th Leg., R.S., tape 3, side B (Apr. 19, 1999).

46. *Hearings on S.B. 30 Before the House State Affairs Comm.,* 76th Leg., R.S., tape 3, side B (Apr. 19, 1999).

## III

I described the circumstances of this case in my dissenting opinion in *Doe 1(I)*,[47] to which I refer today's reader. Prior to the hearing on remand, Doe returned to Planned Parenthood and spoke with an unlicensed counselor for about one-and-one-half hours and with a physician for about fifteen minutes. She also looked at pamphlets concerning abortion and alternatives to it. The only other person she talked with after the first hearing was a teacher at school who counsels pregnant students. After a lengthy hearing, Doe's attorney stated to the trial court that the only ground on which Doe sought approval of her application was that she was "mature and sufficiently well informed" to have an abortion without telling her parents. The trial court again denied her application, finding as follows:

> Jane Doe has failed to prove by a preponderance of the evidence that she is sufficiently well informed to have an abortion without notification to either of her parents. While she has been well apprised of the risks attendant to abortion and childbirth, she has received inadequate counseling, and has shown no understanding, of the benefits and consequences of the alternatives to abortion. She admits that she does not know the benefits of keeping the child, and she presented no testimony that she has been counseled or understands the benefits of adoption. Thus, she has not demonstrated that she has given thoughtful consideration to her alternatives, including adoption and keeping the child. Additionally, and not in issue, she has not sufficiently proved that notifying the parents is not in her best interest, or that notifying her parents will lead to abuse.

The trial court did not find whether Doe was mature. The court of appeals affirmed the trial court's ruling and stated that it would issue an opinion as permitted by Rule 3.3(e)(2)(A) of the Parental Notification Rules.

This Court cites evidence contrary to the trial court's decision, but such evidence is, of course, irrelevant to this Court's review. The issue is not whether there was evidence to support a grant of Doe's application; there was. Rather, the issue is whether there is any evidence to support the trial court's denial of the application. There was, and thus the trial court's decision must be affirmed. This Court cannot grant Doe's application merely because it disagrees with the trial court on a judgment call, nor can it do so merely because it thinks the evidence was overwhelmingly contrary to the trial court's ruling. This Court can reverse and render, as it does, only if no evidence supports the trial court's ruling—that is, only if no reasonable person could have reached the conclusion the trial court did.

The evidence that supports the trial court's ruling is this:

First: Doe admitted that she is inexperienced, even for her age, and that is evidence that she should discuss her situation with her parents. Concerning her understanding of the alternatives to abortion, Doe testified as follows in answer to questions by her attorney:

> Q You also indicated that the counselor at Planned Parenthood talked to you about the alternatives of abortion. What did she say?
>
> A Well, I have several pamphlets there, also; but she talked to me. You can choose parenthood, also adoption, and there is the abortion there, and there are agencies where you can do adoption. Planned Parenthood is one of the locations they do perform abortion if I do choose to go, if that comes up. And the effects of what happens if you actually decide to have the child, the parenthood, child.

\* \* \*

> Q I would like, for the Court, to go over the three alternatives and essen-

47. *Doe 1(I)*, 19 S.W.3d at 266 (Hecht, J., dissenting).

tially describe for the Court your thought processes. Let's start with the alternative of keeping your child and becoming a parent.

A Okay. Well, if I were to keep this child I feel that it would be very difficult for me being at a very young age and wanting to further my education. I would like to go to college. I don't want to have to immediately join a minimum wage job because since I am so young and inexperienced that is what I would have to do to support my child. I am saying I would like to go to college and have a career. And personally I would like to be married and settled down before I have a child. I want to be financially stable. I want to be responsible enough. I want to be older. And that's why I am not ready for the parenthood factor.

Q Okay. Let's talk about, then, the adoption alternative, carrying the child to term, having the child and giving it up for adoption.

A Okay. Well, personally, I feel if I were to carry this child for nine months that I would grow emotionally attached to this child. And to give it away to another family would not feel right to me after all those nine months. Plus, I don't know if it would be put in a worse lifestyle than what I could give it or if the parents would care for it and love it actually as their own. So, I am just not against—I am not for adoption.

Q Okay. Let's talk about the abortion alternative here, your thought process in choosing that alternative.

A Okay. Well, I mean my situation, again, I feel abortion is the best decision for me. It would help me further my education, that I would like to do. I mean, right now it is the best way that I can go through this.

Although Doe's answers show some understanding of her alternatives, they also reflect, as she freely acknowledged, that she is young and inexperienced.

Second: Doe has never had to make a decision approaching the seriousness of having an abortion. She described her most significant financial decision as helping her parents to pay for her vehicle, which she does intermittently, and her most significant life decision as deciding to go to college.

Third: Doe admitted that she had not "sought counseling from anyone that had a view that abortion either would not be good for you emotionally, spiritually or physically." In the first hearing Doe described briefly her discussions with three teenage friends, her boy friend, and an older relative.[48] Since then she has talked only with a teacher at school and a counselor at Planned Parenthood. No mature and well informed person would make any serious decision without considering the pros and cons. There is a large amount of information both for and against abortion, and while the Court held in *Doe 1(I)* that Doe need not obtain information from any specific source,[49] a minor cannot be well informed if the only information she has is from people who favor abortion. As the United States Supreme Court has observed, "It seems unlikely that [a woman] will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place."[50]

Fourth: Doe testified that her parents have strong views against abortion and that she does not want to tell them of her decision because they would disapprove. The trial court could have found that her unwillingness to understand and consider views in opposition to her desire to have an abortion, especially the views of her family,

---

**48.** *Doe 1(I)*, 19 S.W.3d at 276 (Hecht, J., dissenting).

**49.** *Doe 1(I)*, 19 S.W.3d at 257.

**50.** *H.L. v. Matheson*, 450 U.S. 398, 410, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981).

showed that she was not sufficiently well informed to make the decision.

The court of appeals' opinion, to which the Court briefly refers, undertakes a traditional assessment of the sufficiency of the evidence, the point of which is to see whether there is any material evidence to support the trial court's decision, not to see how much evidence there is to the contrary. The court of appeals did a creditable job of reviewing the record and setting out the evidence in support of the trial court's decision, yet the Court simply ignores its opinion.

In sum, there is evidence to support the trial court's denial of Doe's application. This Court simply usurps the trial court's fact-finding authority, which it would not do in any other case, and ignores the limitations on appellate review. The Court offers no justification of its actions, and the only apparent explanation is its complete disregard of the lower courts' authority and its antagonism to the Legislature's purposes in the Parental Notification Act.

## IV

One must ask why the Court is so determined to grant parental bypass applications so handily, why the Court has acted in such haste, and why the Court has such disregard for the lower courts' rulings. In this case, the Court made no effort to determine when the court of appeals might issue an opinion or whether it could expedite the process. The Court does not care what the court of appeals thinks.

The rationale for the Court's rulings, I think, is that the Court does not regard the decision to have an abortion as being a very important one. Minors should generally be allowed to make that decision by themselves, the Court thinks, even though the law does not allow them to decide whether to have a tonsillectomy. A tonsillectomy is serious surgery; an abortion, the Court thinks, is not. Also, the Court believes that minors need not know much more about the process than what they can find out in a short visit to Planned Parent-

hood. If their parents are opposed to abortion, that is reason enough to avoid telling them. And most importantly, according to the Court, minors need not give much consideration to their parents' rights to guide their lives, or their own need for parental involvement in their major, life-changing decisions. The MEMBERS of the Court are certainly entitled to their views on all these issues, but those views must yield to the legislative will expressed in the Parental Notification Act. The plain fact is that that statute was enacted to protect parents' rights to involve themselves in their children's decisions and to encourage that involvement, as well as to discourage teenage pregnancy and abortion. The Court not only ignores those purposes, it has done what it can to defeat them.

\* \* \* \* \*

The trial court acted reasonably in denying Doe's application for authority to have an abortion without telling her parents. This Court's reversal of that ruling thwarts the Legislature's purposes in the Parental Notification Act, violates parents' fundamental, constitutional rights to raise their children, usurps the trial court's authority to find facts, and trivializes the decision to have an abortion. I dissent.

Justice OWEN, dissenting.

Rather than conduct an appellate review to determine if there was evidence to support the lower courts' determination, this Court has usurped the role of the trial court, reweighed the evidence, and drawn its own conclusions. The Court has forsaken any semblance of abiding by principles of appellate review. I would affirm the judgment in this case because there is some evidence that (1) Jane Doe did not receive adequate counseling about alternatives to abortion and has not given thoughtful consideration to those alternatives, and (2) Doe does not have the maturity to make the decision to proceed with

an abortion without notifying one of her parents.

But I dissent from far more than the judgment rendered in this particular appeal. I strongly dissent from the methods employed by the Court in rendering that judgment. The Court summarily reversed the lower courts, without an opinion and without the opportunity for considered, substantive deliberations. Now that the Court has, after the fact, issued an opinion, it has obliterated, with the stroke of a pen, more than fifty years of precedent regarding appellate review of a trial court's findings. The Court's actions raise disturbing questions about its commitment to the rule of law and to the process that is fundamental to the public's trust in the judiciary.

## I

This is Doe's second appeal to this Court. On the first appeal, the Court did not find any error in the trial court's judgment denying her application or in the court of appeals' judgment affirming that denial. However, the Court remanded this matter to the trial court for further consideration in the interest of justice. See In re Jane Doe, 19 S.W.3d 249, 257 (Tex.2000) (Jane Doe 1(I) ).

After the case was remanded, the trial court held a second hearing and again denied the application. The court of appeals again affirmed. The transcript of the trial court's second hearing was received by this Court during the evening on Wednesday, March 8, and other parts of the record were received on Thursday, March 9. The Court, by a vote of five to four, saw fit to render judgment in this case on Friday, March 10, summarily reversing the decisions of the two lower courts.

The Court's hasty rendition was remarkable for a number of reasons. I will not subject most of those reasons to the public scrutiny that they deserve out of an abundance of caution that to do so might violate the Code of Judicial Conduct.[1] I recount only facts that do not disclose the actual discussions or lack of discussions about this case. First, not even an abbreviated opinion, much less analysis, accompanied the Court's ruling. There was no explanation of the substantive grounds for the ruling, nor was there an explanation of the need to render final judgment without an opinion or at least a notation. Cf. Republican Party v. Dietz, 924 S.W.2d 932, 932 (Tex.1996) (granting emergency relief in an abbreviated opinion after hearing expedited oral arguments with a final opinion to follow). Second, the Court summarily reversed the lower courts and rendered judgment on March 10, less than forty-eight hours after it received the record at about 8:00 p.m. on March 8. When it rendered judgment, how likely is it that the Court had before it a draft of an opinion that carefully analyzed the evidence in the 125 pages of testimony from the second hearing? Third, even though every member of the Court recognized that expedition of this, Doe's second appeal, was essential, Doe did not so much as hint that immediate or summary disposition was necessary for a medical or any other reason. Doe's notice of appeal was typed onto the standard form this Court has promulgated for parental notification cases, and that printed form includes "ATTENTION CLERK: PLEASE EXPEDITE" on it. But Doe did not request that the Court rule on or before any particular date, nor was there any indication that Doe would suffer adverse consequences if the Court did not rule by March

---

1. Canon 3 provides in relevant part:

 A judge shall not disclose or use, for any purpose unrelated to judicial duties, non-public information acquired in a judicial capacity. The discussions, votes, positions taken, and writings of appellate judges and court personnel about causes are confidences of the court and shall be revealed only through a court's judgment, a written opinion or in accordance with Supreme Court guidelines for a court approved history project.

 TEX.CODE JUD. CONDUCT, Canon 3(B)(11).

10. Why then the rush to judgment? The Court does not and cannot legitimately explain why it did not wait until the following Monday, March 13, to issue its judgment accompanied by opinions.

The evidence is undisputed that on March 10, the day the Court summarily rendered judgment, Doe had been pregnant for fourteen weeks and that the following day was the beginning of her fifteenth week. The Court says that Doe might "be able to undergo the less risky suction curettage procedure" if it acted on March 10. 19 S.W.3d at 355. I must say in the strongest terms that this statement has *no basis whatsoever* in the evidence, argument of counsel to the trial court, or any of the briefing in any of the three courts that have considered this matter. On what, then, does the Court base its assertions?

The "evidence" comes from Planned Parenthood pamphlets that were offered to show what Doe had reviewed in deciding to have an abortion. Even that "evidence" belies the Court's claims that it had to act by March 10. The "fact sheet" given to Doe by the Planned Parenthood clinic where she sought counseling says that vacuum aspiration or suction curettage is offered by Planned Parenthood "through the end of the 13th week of pregnancy." According to Doe's testimony at the hearing, the end of her thirteenth week of pregnancy was March 3, seven days before the Court rendered judgment. Doe testified that a sonogram was performed on February 19 and that she was told that, on that day, the stage of her pregnancy was eleven weeks and one day. The pamphlets from which the Court quotes also say that abortions in the "second trimester (14 through 24 weeks of pregnancy) . . . are more complicated procedures but are also quite safe." The Court's "evidence" thus says that by March 11, the first day that Doe could conceivably have obtained an abortion after the Court rendered judgment at the close of business on March 10, Doe was already in her fifteenth week of pregnancy

and was already well beyond the stage at which a vacuum aspiration or suction curettage would be performed.

The Court cites a *court decision* in support of its statement that "[e]vidence admitted at the hearing indicated that the 'safest method' for performing an early abortion, a suction curettage or vacuum aspiration procedure, is used until the fourteenth week of pregnancy." 19 S.W.3d at 354. That decision, *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 198 (6th Cir.1997), which the Court says indicates that " '[s]uction curettage can sometimes be performed up to the fifteenth week of pregnancy,' " was not mentioned in the trial court or any of the briefing in this or the court of appeals. 19 S.W.3d at 354. And a statement in a court opinion is not a substitute for competent medical evidence. But even accepting the statement in *Voinovich* at face value, it says only that suction curettage is sometimes performed *up to* the fifteenth week. Doe was beginning her fifteenth week when the Court rendered judgment. The point that cannot be overemphasized is that there is no indication in the record in this case that Doe could obtain an abortion by means of suction curettage or vacuum aspiration during her fourteenth week of pregnancy, much less her fifteenth week, and absolutely no indication from *any source* that issuing a decision on March 13 or even 14 or 15 would have placed Doe in any greater risk. Doe did not so much as hint that she would be at greater risk unless the Court acted on or before March 10. Indeed, she had sought and obtained a seven-day continuance in the court of appeals just before coming to this Court.

The other reasons offered by the Court to explain its hasty rendition are that "we had to also consider that any additional delay might call into question whether the proceedings were sufficiently expeditious to pass constitutional muster," and that the Court must rule as " 'soon as possible' " under our rules of procedure. 19 S.W.3d at 355. If those were the motivat-

ing factors behind the Court's actions, how then does it explain its treatment of *Jane Doe 4*, 19 S.W.3d 322, 325 (Tex.2000)? Jane Doe 4's appeal languished in this Court for fifteen days before a decision was announced in an opinion of the Court. Jane Doe 1's proceeding was in the Texas court system for thirty-one days from the day she filed her application, Jane Doe 4's for twenty-seven.

Bluntly put, the Court has manufactured reasons to justify its action. Equally troubling is the lack of process accorded in this case. Once judgment had issued, and presumably Doe had proceeded with an abortion without the knowledge or consultation of either of her parents, how likely was it that any member of the Court who voted to summarily reverse the court of appeals' and trial court's judgments and render judgment for Doe would be inclined to give studied consideration to writings offered by dissenting members? How likely was it that on consideration of written analyses, any of the five members of the Court who voted to hastily issue a judgment would change his or her mind and correspondingly, his or her vote?

## II

Doe contends that she has demonstrated as a matter of law one of the three grounds under section 33.003(i) of the Family Code that would entitle her to proceed with an abortion without notifying a parent. Tex. Fam.Code § 33.003(i). It is her position that she is "mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents." *Id.* The trial court was unpersuaded and ruled against her. The court of appeals affirmed that judgment.

One of the many remarkable statements in the Court's opinion attempting to justify its reversal and rendition in this case is that because the trial court did not make a specific finding that Doe had not shown maturity, the Court is empowered to presume that Doe is mature. *See* 19 S.W.3d at 357–58. The Court thus overrules more than fifty years of precedent.

Until today, it had been well-settled law that when a trial court makes findings of fact and conclusions of law, an appellate court must presume that the evidence supports "not only the express findings ... but also any omitted findings which are necessary to support the judgment," unless the record does not support the judgment. *Wisdom v. Smith*, 146 Tex. 420, 209 S.W.2d 164, 166–67 (1948); *Page v. Central Bank & Trust Co.*, 548 S.W.2d 802, 804 (Tex.Civ.App.—Eastland 1977, no writ); *Gulf States Theatres v. Hayes*, 534 S.W.2d 406, 407 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.); *Go Int'l, Inc. v. Big–Tex Crude Oil Co.*, 531 S.W.2d 208, 210 (Tex. Civ.App.—Eastland 1975, no writ); *Ives v. Watson*, 521 S.W.2d 930, 934 (Tex.Civ. App.—Beaumont 1975, writ ref'd n.r.e.); *see also In re Anglin*, 542 S.W.2d 927, 930 (Tex.Civ.App.—Dallas 1976, no writ); *In re Herd*, 537 S.W.2d 950, 954 (Tex.Civ. App.—Amarillo 1976, writ ref'd n.r.e.); *Allied Bldg. Credits, Inc. v. Grogan Builders Supply Co.*, 365 S.W.2d 692, 695 (Tex.Civ.App.Houston—1963, writ ref'd n.r.e.). Our rules of procedure have long provided that when a trial court finds one or more elements of a ground of recovery or defense, omitted elements "will be supplied by presumption in support of the judgment" if supported by the evidence and no request to make findings regarding the omitted elements has been made. Tex.R. Civ. P. 299.[2]

2. Rule 299 provides in its entirety:

When findings of fact are filed by the trial court they shall form the basis of the judgment upon all grounds of recovery and of defense embraced therein. The judgment may not be supported upon appeal by a presumed finding upon any ground of re-

covery or defense, no element of which has been included in the findings of fact; but when one or more elements thereof have been found by the trial court, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment. Refusal of the

I recognize that given the short time periods prescribed by section 33.003, the procedures set forth in our rules of procedure that complement Rule 299 conflict with section 33.003 and that the detailed process for requesting additional findings of fact and conclusions of law does not apply. *See generally Johnstone v. State,* 22 S.W.3d 408-10, (Tex.2000) (holding that Tex.R. Civ. P. 329b, requiring a motion for new trial to preserve factual sufficiency challenges, conflicted with Tex. Health & Safety Code § 574.070, which required a notice of appeal from an order of temporary commitment to a mental health facility to be filed within ten days). But the fact that Rule 299 cannot be applied in parental notification cases does not mean that the Legislature intended to override well-established common-law principles regarding appellate review. *See Cates v. Clark,* 33 S.W.2d 1065, 1066 (Tex.1931) (citing the "well-recognized rule of law" that, if the trial court has made findings of fact and the evidence in the record supports the trial court's judgment, it is presumed that all facts were found in support of the judgment); *Lincoln Nat'l. Life Ins. Co. v. Anderson,* 71 S.W.2d 555, 559 (Tex. Civ.App.—Waco 1934,), *modified on other grounds,* 124 Tex. 556, 80 S.W.2d 294 (Tex. Comm'n App.1935) (reasoning that if a trial court failed to expressly find a fact in support of the judgment, then that fact may be inferred if supported by the record); *cf. Central Tex. Ice Co. v. Thomas,* 45 S.W.2d 181, 182 (Tex. Comm'm App. 1932, holding approved) (holding that, because the evidence supported the trial court judgment, the court of appeals' affirming of the trial court's judgment did not violate the rule that an appellate court cannot presume a fact in support of a judgment that the record shows was not a fact); Henry Finch Holland, *Appeal and Error—Non Jury Trial—Presumption as to Omitted Findings,* 14 Tex. L.Rev.518, 519–22 (1936).

The Legislature directed trial courts to make findings of fact and conclusions of law. *See* Tex. Fam.Code § 33.003(h). The trial court in this case did so. Under well-established precedent, a reviewing court must presume that the trial court's judgment in this case is supported not only by its express finding that Doe was not sufficiently well informed, but also by its implied finding that Doe was not mature enough to make the decision to have an abortion without notification of a parent. Doe had the burden of establishing both elements of that ground fro proceeding with an abortion without notification. Nothing in the Family Code indicates that the Legislature intended to override the appellate principle that an omitted finding on one ground for relief will be presumed to support the judgment.

Nor did I understand the Court's decision in *Jane Doe 1(I)* to overrule or disapprove of the foregoing decisions when the Court suggested that trial courts make specific findings regarding maturity or credibility to aid appellate review. *Jane Doe 1(I),* 19 S.W.3d at 257. But today's decision dispenses with that long-standing law.

The Court says that a finding regarding maturity was not necessary to the judgment. *See* 19 S.W.3d at 357–58. The Court misunderstands the law. One basis on which a trial court may grant authorization for a minor to proceed with an abortion without notifying a parent is if she is mature and sufficiently well informed. Thus, there are two necessary elements to this ground for relief. Appellate review of a failure to find that a minor was entitled to an abortion on this ground is the same as any other failure to find for a party who has the burden of proof on a particular ground for relief, such as negligence. If a trial court found that there was no negligence, for example, but an appellate court concluded that negligence per se had been established as a matter of law, that conclu-

court to make a finding requested shall be reviewable on appeal.

Tex.R. Civ. P. 299.

sion, standing alone, would not authorize the appellate court to reverse the trial court's judgment. The appellate court must presume that the trial court also failed to find proximate cause even if there were no express finding on that element of the plaintiff's cause of action. If there were evidence that the negligence did not proximately cause the plaintiff's injury, the appellate court would be required to uphold the trial court's judgment based on the implied finding of no proximate cause. Here, since the Court concludes that Doe established as a matter of law that she was sufficiently well informed, it must imply a finding in support of the judgment on the other element that Doe must prove, which is maturity. The Court must then determine if there is any evidence to support the trial court's failure to find that Doe was mature. I turn to the evidence in the record regarding Doe's maturity.

### III

Doe is a senior in high school and still lives at home. Her parents provide for substantially all her needs. They recently purchased a new vehicle for her use now and when she goes to college in the fall. Although some of Doe's earnings from a part-time job help to defray the cost of insurance, Doe's parents are paying for this vehicle. Doe also contemplates that her parents will pay for her college education. When asked why she did not want to tell either of her parents that she was pregnant and intended to have an abortion, Doe testified that it would upset them because they do not "believe in abortion." A pregnant minor's desire not to upset her parents is not a basis for concluding as a matter of law that she is mature. *See In re T.P.,* 475 N.E.2d 312, 315 (Ind.1985).

But the more telling testimony is that Doe said that she feared that her parents would no longer provide financial assistance to her if they knew that she had an abortion. She testified that she intended to tell them some day that she had an abortion "when she was ready." A reasonable inference from this testimony is that after Doe's parents have paid most of her living, transportation, and education expenses over the next few years, she will tell them the truth, when there will be fewer consequences to face. This is some evidence that Doe is not mature enough to accept responsibility for her actions or her future. She intends to continue to seek and take support from her parents in virtually all aspects of her life, but not with regard to her decision to have an abortion. The trial court could reasonably find that Doe was not mature enough to make the abortion decision without telling one of her parents.

### IV

The Court's analysis of whether Doe was sufficiently well informed is also incorrect. If the Court were to follow well-established law, it would consider evidence in the record that *supports* the trial court's judgment rather than disregard that evidence. Doe bears the burden of proof in this case. *See* TEX. FAM.CODE § 33.003. In order for the Court to reverse and render judgment in her favor, it must examine the record to determine if there is any evidence that supports the trial court's failure to find that Doe was sufficiently well informed. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence to support the trial court's failure to make an affirmative finding, then the Court must still determine whether, based on the entire record, "the contrary proposition is established as a matter of law." *Id.* The evidence must be such that reasonable minds can draw only one conclusion. *See Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). There must be no evidence of probative force to raise a material fact question. *See id.* Although this is a close case, there is some evidence from which a trial court could reasonably conclude that Doe was not sufficiently well informed to make the decision to have an abortion without notification of a parent.

There is some evidence that the counseling Doe received about alternatives to abortion was inadequate and that Doe had not thoughtfully considered her alternatives. Doe said that she had received information about adoption or keeping her child from three sources other than a family member, the teenage father of her unborn child, and other teenage friends. Those were (1) an unlicensed counselor at the clinic where she intended to have an abortion, (2) pamphlets that she was given at the clinic, and (3) her home economics teacher who also teaches parenting to students other than Doe.

Doe did not explain the substance of the counseling she received at the abortion clinic about her alternatives besides abortion, other than to say that "[w]e basically went over making sure there is no pressure on me by anybody; making sure that I am aware of every decision I have; making sure that this is right for me and this is truly what I want." Doe did not, or was not able to, explain what she understood might be involved in an adoption. She expressed concern that if her child were placed for adoption, she would not be able to determine if it was placed in a loving home and given adequate care. Doe was clearly uninformed about the screening required before a child is placed in the home of prospective parents or the continued supervision after the child is placed. Similarly, she did not exhibit any understanding about open adoption, even though a witness from Planned Parenthood whom Doe had never met or talked to testified at the hearing that open adoption was an option.

The Court says that the counselor with whom Doe did speak at the clinic "told Doe what would happen if she decided to keep the child." 19 S.W.3d at 360. This, like other of the Court's statements, finds no support in the record. Moreover, it is clear from Doe's testimony that she had not been counseled about or had not considered all her options if she kept her child. The Court says "adoption was not a realistic option for [Doe] because she would grow emotionally attached to the child after birth and would be unwilling to give the child up." 19 S.W.3d at 359. This is an accurate paraphrase of the testimony, but it reveals that Doe did not consider whether her parents would help her raise the child or raise it themselves if she decided to carry her baby to term. Similarly, Doe expressed concern about her ability to provide financial support for her child, but she did not indicate that she had considered whether her parents would support her and her child if she decided to have it.

Doe did not relate any information that she received from her home economics teacher about alternatives to abortion. Doe said that she does not know if her teacher supports her decision, "but she [her teacher] feels like if I feel this is the best thing for me that it is not a problem. She understands the circumstances." The issue was not what Doe's teacher understands, but what Doe understands.

The pamphlets that Doe received and read "several times" from the clinic where her abortion presumably has now been performed focus almost exclusively on the abortion procedure and potential complications. The pamphlets did not provide adequate information about adoption or parenting. There was no information about safeguards for the child during the adoption process or about open adoption. The Court's statement that a section in one of the pamphlets "explains the procedure" is not borne out by the record. More importantly, reading the sparse information contained in the pamphlets about adoption or raising a child is not the equivalent of meaningful counseling from a qualified source. While the pamphlets do say, as the Court notes, that information about pregnancy care, parenting skills, and sources of financial help for pregnant women *could* be provided, there is no evidence that such information *was* provided to Doe.

Finally, the record indicates that Doe did not seek advice or counseling from anyone who was inclined to thoroughly explore with her the adverse emotional and psychological impact that an abortion may have. Doe affirmatively avoided counseling from any source who might cause her to seriously examine her decision in a meaningful way, as notifying one of her parents may have caused her to do.

The question in this case is not whether this Court would have ruled differently when confronted with all the evidence that the trial court heard. The question is whether legally sufficient evidence supports the trial court's judgment. The answer to this latter question is yes. Long-standing principles of appellate review and our Texas Constitution do not permit this Court to substitute its judgment for that of the trial court and or to ignore the evidence, as it has done.

## V

The Court says that "judges' personal views may inspire inflammatory and irresponsible rhetoric" and that the "highly-charged nature [of abortion issues] does not excuse judges who impose their own personal convictions into what must be a strictly legal inquiry." 19 S.W.3d at 356. To which judge or judges does the Court refer? To the judge of the trial court, who saw and heard Doe testify in person during the course of two hearings and made findings that are supported by the record? To the three justices on the court of appeals who reviewed the record and wrote a thoughtful opinion that cannot be characterized as inflammatory or as containing irresponsible rhetoric? To one or more of the justices on this Court?

I challenge the Court to state plainly how any judge's personal convictions have entered into analyzing what is strictly a legal issue in this case. That issue is whether there was some evidence to support the trial court's failure to find by a preponderance of the evidence that Doe was mature and sufficiently well informed to make a decision to have an abortion without notifying one of her parents. It is the Court who has acted irresponsibly in this case by summarily rendering judgment without careful consideration of the record, by manufacturing reasons to support its actions, and by ignoring the evidence that supports the trial court's judgment.

\* \* \* \* \*

I dissent from the Court's judgment in this case and from the manner in which this appeal has been resolved. The Court has disregarded the law and has trampled the process on which the legitimacy of our law depends.

Justice ABBOTT, dissenting.

I dissent from the Court's judgment and opinion. I write separately to elaborate on the intended purpose of the Parental Notification Act.

To a large degree, the Court has played a guessing game in its struggle to apply the language of the Act. It has attempted to discern what the Legislature meant when it used certain terms. As it turns out, the Court has guessed wrong on certain issues. That is made clear by the two legislative sponsors of the Act. Those two sponsors, Senator Florence Shapiro and Representative Dianne White Delisi, filed an amicus brief in this cause that was joined by eight Senators and forty-six Representatives.[1] In that brief, the legis-

1. The Senators who joined the amicus brief include Ken Armbrister, Teel Bivins, Troy Fraser, Chris Harris, Tom Haywood, Mike Jackson, Eddie Lucio, and Drew Nixon. The Representatives who joined the brief include Ray Allen, Kip Averitt, Leo Berman, Betty Brown, Fred Brown, Warren Chisum, Wayne Christian, Ron Clark, Tom Craddick, John Davis, Mary Denny, Joe Driver, Al Edwards, Dan Ellis, Kenn George, Tony Goolsby, Rick Green, Rick Hardcastle, Talmadge Heflin, Harvey Hilderbran, Charlie Howard, Bob Hunter, Suzanna Gratia Hupp, Carl H. Isett, Terry Keel, Jim Keffer, Phil King, Mike Kru-

lators clarify the intent behind the language used in the Act and reference several of the ways the Court has departed from that intent. Because the brief provides meaningful insight into the appropriate way to interpret the Act, I feel it important to *quote* from the brief at length—the hope being that judges who must interpret and apply the Act in the future will be aided by the clarity provided by the Act's sponsors. The legislators begin by explaining the need for clarity. They state: [2]

> The provisions of this Chapter went into effect on January 1 of this year. In the three months the Act has been in effect, this Court has been called upon to interpret the judicial bypass provisions of Chapter 33 numerous times. Within the last month, this Court issued five rulings in four cases by way of sixteen separate opinions, with three opinions yet to be released. Amici are unaware of any other Texas statute that has generated nineteen opinions in the first four cases construing it, and there is reason to believe that this Court will continue to be called upon to provide guidance regarding the proper interpretation and application of this Act.

> In arriving at the varied interpretations offered in the Court's numerous opinions, members of this Court have relied upon inferences regarding legislative intent. *Amici file this brief in order to assist the Court in more accurately discerning the intended purpose, scope, and application of the Act.* [footnotes omitted]

(Emphasis added).

The legislators summarize their argument as follows:

> In passing the Texas Parental Notification Act the Legislature intended to restore parents' natural authority to act as chief advisors to their minor daughters who become pregnant, and seek abortions. . . .

> The operative assumption of the Act is that a parent will receive notice and react responsibly. Nonetheless, the Legislature recognized that there are exceptional circumstances in which parental notification is not in the minor's best interest. While convinced that such cases are rare, they are sufficiently important to require some means of addressing them. The judicial bypass was the means selected by the Legislature.

> In establishing the procedure for judicially bypassing parental notification, the Legislature intended courts to exercise their traditional function of assessing and weighing the evidence before rendering judgment. The evidence is to be weighed against the long-standing presumption that minors lack the experience, perspective, and judgment critical to making sound decisions, and the presumption that parents should be involved in all medical decisions for their children. . . . To avoid potential overreaching by those who are advising the girl, courts should require a showing that she has received information from a variety of sources, or that the information she has received is from a neutral, reliable, and informed source. Only when the minor is truly competent and well informed, or when the court is convinced that the minor's best interest is served by allowing her to consent to a secret abortion, should the court authorize the minor to consent to an abortion without notice being given to her parent.

> In cases involving allegations of abuse, it is important to distinguish the real from the hypothetical. Few minors should anticipate an indifferent or

---

see, Jerry Madden, Kenny Marchant, Geanie Morrison, Anna Mowery, Joe Nixon, Dora Olivo, Sue Palmer, Jim Pitts, Elvira Reyna, John Shields, Bill Siebert, John Smithee, Todd Staples, David Swinford, Robert Talton, Vicki Truitt, Buddy West, and Arlene Wohlgemuth.

**2.** Unless indicated otherwise, all footnotes in the legislative amici's argument are included, and have been renumbered here.

pleased response by their parents when they first learn of her unplanned pregnancy. Many girls can honestly testify to having heard statements like "don't bother to come home if you get pregnant," or "I'll kill you if you do that to me." Yet despite such hyperbole, the vast majority of parents mean just the opposite—"come home immediately if you're in trouble," or "I'd give my own life for you because you are my child." In order to distinguish realistic threats from rhetorical overstatement, and unsafe situations from uncomfortable ones, courts need clear and objective definitions of abuse. Section 261.001 [of the Family Code] provides exactly that and should be used by courts in making the difficult decision whether to intervene in the parent-child relationship at this painful time in the minor's life.

The legislators contend that "the legislative record establishes that judicial bypass of parental notification should only be granted in cases where a minor overcomes the strong presumption in favor of parental involvement by a preponderance of the evidence." In support of that contention, they argue:

> Justice Enoch, in his concurrence in *In re Jane Doe,*[3] made the following observation regarding the evidentiary standard in the Parental Notification Act:
>
> Because of the nature of this proceeding, then, all the evidence in the record will be undisputed. But the stan-

dard the Legislature chose for trial courts to apply in determining whether a minor is "mature and sufficiently well informed"—preponderance of the evidence—is typically associated with weighing conflicting evidence after an adversarial proceeding. Thus, we have an anomalous situation—the Legislature directs that the minor must demonstrate by a preponderance of the evidence (which generally means more likely than not) that she is mature and sufficiently well-informed, yet because the minor is the only party presenting evidence on these elements, there is no other evidence against which to weigh it to see if it is more likely than not.[4]

Essentially Justice Enoch expresses concern that in weighing the evidence presented in a parental notification bypass case, the trial court has nothing to place in the balance against the untested statements of the minor and those who appear to support her decision.

This concern, however, proves unfounded after review of the legislative record. It was never the intention of the Legislature to place *ex parte* statements of the girl and other interested witnesses on an empty scale. The testimony presented at legislative hearings and the recorded statements of legislators[5] make clear that the evidence produced in support of an application to bypass parental notification is to be carefully weighed against the legal disability of minority, resulting from soci-

---

**3.** [19 S.W.3d 249 (Tex.2000).]

**4.** [*Id.* at 258.]

**5.** Senator Florence Shapiro, Hearing before the Senate Human Services Committee, March 10, 1999, tape 1, at 18 ("Members we are asking for parental involvement in every area of our children's lives except one, an abortion. Currently, Senate Bill 30 is in keeping with the broad and sweeping intent of the whole of Texas law.")[;] Representative Dianne White Delisi, Hearing before the House State Affairs Committee, April 19, 1999, tape 1, side A[;] Representative Leo

Alvarado, Jr., Hearing before the House State Affairs Committee, April 19, 1999, tape 3, side A (expressing concern that bypass under any parental involvement bill be limited to cases where there is adequate evidence "If a girl goes 'My father is going to beat me up' even though he has probably never beat her up in her life, is that going to determine that it is not in her best interest to tell her father?"); David Scott Miller, M.D., Hearing before the House State Affairs Committee, April 19, 1999, tape 6, side B (opposing Senate Bill 30, acknowledging that he requires parental involvement in every other non-emergency procedure).

ety's recognition of minors' lack of judgment and understanding, [footnote omitted] and the strong presumption running through all Texas law that minors benefit from the involvement of their parents.

*Legislators were unanimous in their characterization of the bypass as "rare" or exceptional.*[6] The examples of cases involving use of the judicial bypass given by legislators during committee hearings or floor debate involved young girls facing dire circumstances. Senator Gallegos expressed repeated concern about girls who would be hospitalized or die due to abuse by parents who became outraged at the news of their daughter's pregnancy.[7] Members of the House State Affairs Committee discussed use of the bypass in the context of the incest victim's needs.[8] Representative Gray, in laying out House Bill 5 in committee, provided an even more detailed example of cases where bypass should be granted by discussing a hypothetical ten-year-old victim of incest.[9] On the second reading of the Committee Substitute for Senate Bill 30 in the House of Representatives, Representative Gray offered a further example of bypass being appropriate in cases where "one parent may be in prison [and] another one may be on the streets with their own health problems".[10] In the House floor debate Representative Giddings gave the example of a mother who had agreed to require her daughter to have sex with the mother's new husband.[11] At the third, and final reading, of Senate Bill 30, Representative Delisi voiced a continuing concern that victims of incest, [sic] or physical abuse receive protection, and her

6. Senator David Bernsen, Hearing before the Senate Human Services Committee, March 10, 1999, tape 3, at 4 ("those small exceptions" suitable for a bypass procedure); Representative Dianne White Delisi, Hearing before the House State Affairs Committee, April 19, 1999, tape 1, side A ("And you are certainly right, in rare cases when it is not appropriate to tell the girl's parent, then the judge of that court of law is appropriate because they are duly sworn to uphold, and duly sworn to upheld [sic] the best interest of that child."); Representative Patricia Gray, Hearing before the House State Affairs Committee, April 19, 1999, tape 3, side B (referring to only "exceptional" cases as those to be dealt with through a bypass process); Representative Phil King, Hearing before the House State Affairs Committee, April 19, 1999, tape 3, side B (characterizing cases to be dealt with through a bypass as "rare" and parental involvement required in the "vast, vast, vast majority of cases").

7. Senator Mario Gallegos, Jr., Hearing before the Senate Human Services Committee, March 10, 1999, tape 1, at 22 ("I'd like to take you [Senator Shapiro] to Ben Taub Hospital and, you know, like I spent five years there."); tape 2, at 14 (exploring opinion of Dr. Dave Kittrell that minors would be physically injured or "thrown out on the street"); tape 2, at 25 (exploring opinion of Kae McLaughlin that girls will die due to illegal abortions).

8. Hearing before the House State Affairs Committee, April 19, 1999, tape 2, side A (discussion between Representatives John Amos Longoria, Debra Danburg, and Dianne White Delisi regarding the merits of bypass as an opportunity for the victim to seek protection against continuing abuse), and tape 3, side A (discussion between Representatives David Counts and Dianne White Delisi regarding the confidentiality for incest victims in rural counties)[.]

9. Representative Patricia Gray, Hearing before the House State Affairs Committee, April 19, 1999, tape 3, side B.

10. Representative Patricia Gray, CSSB 30— Statement of Legislative Intent. House Journal, May 21, 1999, 79th Day, at 2753. See also Representative Ron Clark, House Debate on Senate Bill 30, May 21, 1999, tape 158, side B ("[T]here's a fair number where perhaps the father is off in prison somewhere, and the mom's disappeared[.]").

11. Representative Helen Giddings, House Debate on Committee Substitute Senate Bill 30, May 19, 1999, tape 147 side A (statement reproduced in text infra). See also Representative Ron Clark, House Debate on Committee Substitute Senate Bill 30, May 21, 1999, tape 158, side B (giving the example "Look the parent is abusive, the parent, in Ms. Giddings' case is selling the child, we need a judicial bypass.").

belief that SB 30 advanced that goal.[12] Each of these examples involve [sic] extraordinary circumstances presenting a real and present danger that a minor will be grievously harmed if a parent learns she is pregnant.

Certainly there is nothing in the legislative record that supports permitting a bypass based only on the untested statement of a minor that her mother was ill, and she did not want her father notified because he had a temper, and, although he did not "beat" her, he had slapped her on some occasion.[13] Nor is there anything in the legislative record to suggest that a bypass was contemplated in a case where the only evidence is a girl's testimony that she could tell her mother, but her mother would share the information with her father, who is an alcoholic and "takes things out of proportion" and subsequently "take[s] it out on my mom."[14] In short, the Legislature contemplated much stronger evidence that parental notification would not be in a minor's best interest or that it may lead to physical, emotional, or sexual abuse than this Court has required to date.

(Emphasis added). The preceding paragraphs—particularly the last two—clearly demonstrate the Court's unjustifiable departure from the Legislature's intent.

With regard to the trial court's obligation to weigh and consider the evidence—including the minor's testimony—the Legislature has made clear that it is incorrect for the Supreme Court of Texas to base a judicial bypass "on the flimsiest of testimony,[15] or even perhaps, in the absence of relevant evidence, on the basis of statements by the minor's attorney.[16] This was not the intent of the Legislature,

and Texas parents deserve better." Additionally, the legislators state in their brief:

Nowhere [in the legislative record] is it suggested that courts must unquestioningly accept any testimony that a minor offers, or a lawyer evokes. The record, instead, is replete with references to the importance and value of parental involvement, [footnote omitted] the rarity of circumstances that would support judicial bypass of that involvement, [footnote omitted] and the great care and consideration expected of judges prior to authorizing any minor to obtain a secret abortion. [footnote omitted]

... The Legislature expected trial judges to hear the evidence presented by the minor, weigh it against the strong presumptions in Texas law that parental involvement is advantageous, and minors are ill-equipped to make grave and irreversible decisions, and arrive at a reasoned conclusion on the question of whether the minor has established her case. *Requiring trial courts to blindly accept a minor's mere assertion (or that of her lawyer in the form of leading questions or even mere argument to the court) that she is entitled to bypass parental notification by retitling the assertion "a prima facie case" [would be incorrect].* [footnote omitted]

(Emphasis added).

The legislators also contend that they "sought to insure pregnant minors obtained advice from those whose only interest is the best interest of the girl." In support, they state:

Legislators heard many descriptions of the confusion and panic an unplanned

---

12. Representative Dianne White Delisi, CSSB 30—Statement of Legislative Intent. House Journal, May 22, 1999, 80th Day, at 2912.

13. *In re Jane Doe 2*, [19 S.W.3d 278, 283 (Tex.2000) ](Enoch, J.).

14. *In re Jane Doe 3*, [19 S.W.3d 300, 309 (Tex.2000) ] (Hecht, J. dissenting).

15. See *In re Jane Doe 4*, [19 S.W.3d 322, 323–24] (Tex.2000) (Phillips, C.J.) (characterizing evidence as "monosyllabic answers to leading questions" of a girl's court-appointed lawyer).

16. Cf. *In re Jane Doe 3*, [19 S.W.3d 300, 301 (Tex.2000) ] (Gonzales, J. concurring).

pregnancy may cause.[17] Witnesses provided compelling stories of misplaced trust and self-interested advisors.[18] While no legislation can eliminate the confusion of the minor, or insure that all counselors place her interests above their own, *the requirement that mature minors be "sufficiently well informed" limits the minor's reliance upon those who profit only if she decides to obtain an abortion.*

It should go without saying that a minor who consults only with her sexual partner regarding her options in dealing with the pregnancy is not "sufficiently well informed." [19] . . . .

Another possible source of advice, where self interest may override concern for the minor, are facilities which profit only if the girl seeks an abortion. According to the Texas Department of Health, the vast majority of induced abortions are performed in abortion clinics. [footnote omitted] Unlike many private physician's offices, these providers offer only one option in responding to an unplanned pregnancy—abortion. In an ongoing federal lawsuit regarding recent changes in Texas licensing re-

quirements, physicians who provide abortions as part of their general obstetrical practice described abortion clinics as insensitive to the emotional needs of their patients,[20] prone to becoming profit-motivated,[21] and subject to "the cattle herd mentality." [22] The Texas Parental Notification Act was intended, in part, to protect minors from impulsive decisions unduly influenced by those who advocate only one response to unplanned pregnancies—that response being abortion.

. . . .

. . . [B]y requiring that the mature minor be sufficiently well-informed to forego [sic] parental notification, the Legislature intended the courts to assure that the minor receive balanced and complete information. *In order to achieve this legislative goal, it is important that a minor be required to show that she has either received information from a disinterested and reliable health-care provider who is not involved in abortion advocacy and does not stand to profit from any particular choice of the minor, or that she has received informa-*

---

17. Natalie Wolk, Hearing before the Senate Human Services Committee, March 10, 1999, at 2 at 8 ("The teenagers I see [as a counselor at Planned Parenthood of Houston] are very, very scared."); Dave Kittrell, [M.D.,] Hearing before the Senate Human Services Committee, March 10, 1999, at 2 at 11 ("I also know that if they [pregnant teens] perceive that they're going to be embarrassed or have difficulty obtaining parental consent, for whatever their reasons are, these people are in distress, they're in crisis and I, I personally, as a physician, certainly want them to inform their parents."); Margot Clarke, Hearing before the Senate Human Services Committee, March 10, 1999, at 2 at 18 ("[T]hey [pregnant teens] struggle with a sense of being cornered, or hope desperately that it will just go away[.]").

18. Dee Dee Alonzo, Hearing before the Senate Human Services Committee, March 10, 1999, tape 2 at 4–5 (describing continuing sexual assault by high school teacher); Terry Moore, M.D., Hearing before the Senate Human Services Committee, March 10, 1999, at 2 at 17 ("By not enacting this legislation, we

are dooming some of these young girls to continued sexual abuse with the perpetrator getting away and providing the abortions for these young girls[.]").

19. Amici applaud the conclusion of Justice[ ] Gonzales, [joined by Chief Justice] Phillips, [and Justices] Owen, Hecht, and Abbott in *In re Jane Doe 3* that consultation with only the minor's boyfriend was insufficient to establish that she was mature and sufficiently well informed. [19 S.W.3d 300, 301 (Tex.2000) ] (Gonzales, J. joined by Phillips, C.J.); id. at [309] (Hecht, J. joined by Abbott); *id.* at [319] (Owen, J.).

20. *Women's Med. Ctr. of N.W. Houston v. Archer,* Civil No. H–99–3639, Order and Memorandum (Dec. 29, 1999) at 13 (court's summary of testimony by Dr. Fred Hansen) . . . .

21. Id. at 16.

22. Id. at 20 (court's summary of testimony of Dr. Tad Davis).

*tion from multiple sources, at least one of which expresses a preference for childbirth over abortion.*

... Abortion facilities that do not provide prenatal care or adoption services, [sic] would not qualify to. be the sole source of a minor's healthcare information. *Under the test proposed, the minor obtaining information from such a facility would be required to show that she has also obtained information from a source which expressed a preference for childbirth over abortion. Examples of such sources include but are not limited to crisis pregnancy centers, prenatal care clinics that do not provide abortions, or adoption agencies that provide medical services.*

The intention of the Legislature was to insure that mature minors are sufficiently well informed of their options in dealing with an unplanned pregnancy. As part of achieving that objective, the sponsors articulated their desire to insure that minors were advised by those seeking the minor's best interest, free from the taint of any personal gain. By establishing standards that insure trial courts protect minors from relying exclusively upon the advice of those who stand to gain from the minor's choice of abortion, this Court upholds the clear intent of the Act, and remains well within the constitutional standards articulated by the United States Supreme Court in *Planned Parenthood v. Casey*.[23]

(Emphasis added). Despite its protestations about struggling to apply legislative intent, the Court continues to depart from these clearly articulated standards concerning what must be established to ensure that the minor is well informed.

The Legislature makes clear that trial courts must carefully weigh the impact that an abortion may have on a minor:

At the same committee hearings involving Senate Bill 30, the legislative committees heard other bills that proposed requiring parental consent for minors, and informed consent for adult women. All of these bills were supported by testimony regarding post-abortion complications and regret. [footnote omitted] Among the most poignant was the testimony of Ms. Linda Gartman before the Texas Senate Human Services Committee.[24] The long-term emotional and psychological harm testified to by Ms. Gartman and others counsels great caution in endorsing abortion as the solution to every unplanned pregnancy. Because no surgical procedure is entirely risk free, and because of the unique character of abortion, [footnote omitted] courts bear a heavy responsibility when exercising their *parens patriae* power to authorize an immature or ill-informed minor to consent to a secret abortion. To suggest that courts could authorize such action after only inquiring as to whether a parent should be notified is to suggest that courts are free to secretly intervene in the natural and constitutionally-protected relationship of parent and child, usurp the natural prerogative of the parent to make medical decisions for their child, and then irresponsibly abandon the immature minor to make a decision the court has already determined she is unequipped to competently make. *This result is not required under a fair reading of the Parental Notification Act or federal constitutional law, and cannot be an accurate understanding of this Court's view of Texas law.*

In *In re Jane Doe 2*, this Court articulated four factors that a trial court should consider in assessing a minor's claim that parental notification would not be in her best interest.[25] Yet, as

**23.** 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

**24.** Linda Gartman, Hearing before the Senate Human Services Committee, tape 3, at 4–5.

**25.** *In re Jane Doe 2*, [19 S.W.3d 278, 282] (Tex.2000).

Justice Owen notes in her concurring opinion, none of these factors go to the question of whether it is in the best interest of this particular minor to obtain an abortion.[26] There was every expectation by the Legislature that Texas courts would continue their traditional solicitude for the well being of immature minors, and consider not only whether parental notification was in the best interest of the minor, but also whether the decision to obtain an abortion was in her best interest. [footnote omitted].

The legislators further argue that "any bypass for abuse should be based upon evidence of conduct constituting abuse under section 261.001 of the Texas Family Code." In support of that contention, they argue that the:

legislative discussion of abuse involved extreme conduct which would constitute abuse under [section] 261.001 of the Texas Family Code. Statements during the House of Representatives debate regarding Senate Bill 30 provide insight into the legislative understanding of the circumstances that would justify bypassing parental involvement in a minor's decision to obtain an abortion. While there are multiple references to cases involving incest or physical beatings, [footnote omitted] there is only one direct reference to bypassing parental involvement on the basis "that notification may lead to physical, sexual, or emotional abuse of the minor."[27] In discussing a proposed amendment to the bill, Representative Giddings stated:

I know we have provisions in this bill for abused girls when abuse is suspected or detected to get help, but

there are cases where the abuse is not known. I don't know how many of you might be aware that there are two high-profile cases in the Dallas area in the last year. One where a mother married and the young girl that was the daughter, 14 years old was forced to enter into a contract to have a daughter for her stepfather as a part of the marriage. Fortunately, that was discovered and that man is in prison and so is that mother. Additionally, we had a case where a mother had a Norplant put into the arm of her child so that the father could have sex with that child without fear of pregnancy.[28]

Her examples were referred to several times and seems [sic] to be indicative of the general understanding of the type of circumstances that would result in judicial bypass of parental notification due to abuse.[29] *This Court's interpretation of what would constitute adequate evidence of potential "physical, sexual, or emotional abuse" sufficient to justify bypassing parental notification should be informed by the gravity of the situations discussed during the legislative process.*

The legal landscape existing at the time the Parental Notification Act was passed establishes that the Legislature intended abuse to be defined as it is in section 261.001 of the Texas Family Code. The Texas Parental Notification Act did not introduce the phrase "physical, sexual, and emotional abuse" into the lexicon of Texas lawyers. This phrase had a well-defined statutory meaning in section 261.001 of the Texas

26. [*See id.* at 285 (Owen, J., concurring).]

27. Tex. Fam.Code sec. 33.003(i).

28. Representative Helen Giddings, House Debate on Committee Substitute Senate Bill 30, May 19, 1999, tape 147 side A.

29. E.g. Representative Ron Clark, House Debate on Committee Substitute Senate Bill 30,

May 21, 1999, tape 158, side B (giving the example "Look the parent is abusive, the parent, in Ms. Giddings' case is selling the child, we need a judicial bypass."); Representative Arlene Wohlgemuth, House Debate on Senate Bill 30, May 22, 1999, tape 166, side B (opposing clergy bypass because of inadequate protection for girls like the victims in Ms. Giddings [sic] examples).

Family Code before the passage of Senate Bill 30, and had been used repeatedly in several Texas appellate opinions.[30] While the vast majority of Texas cases authorizing any interference with the parent-child relationship involve claims of both emotional abuse and physical or sexual abuse, there appeared to be little uncertainty of what each of these three claims meant.[31] The phrase "emotional abuse" had been used without additional definition or internal reference in at least three other statutes dealing with minors in the Family Code,[32] as well as in two additional statutes in the Human Resources Code.[33]

Nonetheless, in *In re Jane Doe 3*, members of this Court offered not one, but two new definitions of the phrase "emotional abuse." Justice Gonzales, joined by Chief Justice Phillips, looked to the definition of abuse governing elderly protective services, and offered a definition of emotional abuse as "unreasonable conduct causing serious emotional injury."[34] The opinion does not explain why this definition, crafted as a measure of misconduct involving the interaction of adults, is superior to the definition designed specifically to be applied to the interaction of adults with minors.

Justice Enoch, joined by Justices Baker, Hankinson, and O'Neill, provides even less guidance in determining the parameters of "emotional abuse." He rejects the clear definition contained in section 261.001 as inapplicable because the Parental Notification Act does not specifically refer to it in section 33.003(i), although he acknowledges the use of section 261.001 in section 33.008 of the Act regarding a physician's duty to report abuse. In place of the relatively objective criteria found in the statutory definition ("injury to a child that results in an observable and material impairment in the child's growth, development, or psychological functioning"),[35] Justice Enoch suggests "abuse is abuse; it is neither to be trifled with nor its severity to be second guessed."[36] Amici fail to understand the superiority of this non-defining definition over the comparative clarity of the existing statutory definition of "emotional abuse." *Certainly lower courts attempting to decide bypass cases in accordance with the law, rather than personal predilection, find more guidance in the statutory direction to consider "observable and material impairment" than in the mere adjectives "unreasonable" and "serious" found in the definition of Justice Gonzales, or in the refusal to provide any definition found in the opinion authored by Justice Enoch.*

The examples of abuse given throughout the legislative debate in the context of the then-exiting Texas law, and the specific reference in the Act to the definitions contained in section 261.000 of the Family Code, provide clear evidence of the Legislature's intent that the bypass provision, "notification may lead to physical, sexual, or emotional abuse," was intended to incorporate the definitions of section 261.001. To reject the relative certainty of those definitions in favor of the amorphous interpretations offered by various members of this Court is to introduce a level of uncertainty into the Parental Notification Act

---

30. E.g. *State Farm Gen. Ins. Co. v. White*, 955 S.W.2d 474 (Tex.App.-Austin, 1997 [no pet.] ); *Rodriguez v. State*, 1997 WL 527843 (Tex. App.-Dallas, 1997), petition for discretionary review refused (1998).

31. Id.

32. Tex. Fam.Code sec. 32.004(a)(3), 107.052(c), and 162.005(c).

33. Tex. Hum. Res. [Code] sec. 42.059(a), and 40.069(c).

34. *In re Jane Doe 3*, [19 S.W.3d 300, 303 (Tex.2000).]

35. Tex. Fam.Code sec. 261.001.

36. [19 S.W.3d 300, 307 (Tex.2000).]

that disserves the minors seeking judicial bypass, the trial courts required to rule on their applications, and the appellate courts that will ultimately be called to review those trial court rulings. It was not the intention of the Legislature to be vague or uncertain in its guidance on the criteria for judicial bypass, and Amici urges the court [sic] to reconsider the confusion created by searching for alternative definitions when the Texas Family Code already has a clear and functional definition of emotional abuse.

The clear definition of abuse found in section 261.001 facilitates compliance with statutory reporting of abuse requirements. The law of Texas has long insisted on the protection of minors against abuse. Under current statutory protections any person having cause to believe that a minor has suffered harm as the result of abuse must report that belief to appropriate state officials for investigation.[37] The standard is even higher for licensed professionals, in that they must not only report reasonable belief of past abuse, but must also report any reasonable belief of future abuse.[38] The state's concern to insure the protection of children is so strong that it even trumps the interests underlying testimonial privileges, including that of attorney-client. [footnote omitted]

Expression of this concern is continued in the Parental Notification Act by its reporting requirements regarding both past and future abuse.[39] The record is clear that the Texas Legislature intended to protect minors who may be endangered by revealing to a parent their pregnancy or intent to obtain an abortion. The mechanism chosen for this protection was the reminder to professionals involved in bypass cases of

their reporting duties, with specific emphasis on the circumstances that appeared to be most common from the legislative testimony. There was substantial testimony concerning the large number of minors' pregnancies resulting from sexual assault by unrelated parties. [footnote omitted] Similarly there were repeated expressions of concern to protect the unique vulnerabilities of children who are the victims of incest. [footnote omitted] For these reasons, the Act contains specific provisions requiring the reporting of these patterns of conduct. The inclusion of these provisions does not change, nor was it intended to change, the general reporting obligations of professionals under section 261.101 of the Texas Family Code. To suggest otherwise is to abandon the most vulnerable members of our society to continuing degradation and harm. [footnote omitted]

In order to insure compliance with the general reporting duties placed upon the judges, lawyers, and other professionals involved in a judicial bypass case it is important to have clear and objective definitions of the various forms of "abuse." Section 261.001 of the Family Code provides such definitions. Without such clarity and objectivity, the general reporting requirement becomes an invitation to engage in witch hunts—an invitation that undermines the integrity of the family and would harm minors truly at risk of being abused, due to the resources of state officials charged with the protection of minors becoming overwhelmed with questionable or even specious reports.

The Parental Notification Act specifically refers to the definitions of abuse contained in section 261.001 of the Texas

---

37. Tex. Fam.Code sec. 261.101.

38. Id.

39. See Tex. Fam[.] Code sec. 33.008 (physician's duty to report and duty of Department of Protective and Regulatory Services to assist

minor in applying for judicial bypass where appropriate due to evidence of abuse) and Tex. Fam.Code sec. 33.009 (duty of court, guardian ad litem, and attorney ad litem to report sexual crimes committed against the minor).

Family Code. The legislative record expresses unanimous support of the protection of minors who are the victims of abuse. It also expresses unanimous support for parental involvement in the vast majority of cases where a pregnant minor seeks an abortion. What is at issue is defining the circumstances where parental involvement should not occur, and the statute is clear on that issue. It should not occur in those rare circumstances where 1) the minor is mature and sufficiently well informed to make the decision to have an abortion without parental involvement, 2) parental notification is not in the best interest of the immature or ill informed minor and her best interest is served by obtaining an abortion, and 3) where parental notification may lead to physical, sexual, or emotional abuse of the minor. Certainly in the last two circumstances, where the court is exercising *parens patriae* power, the paramount concern must be the well being and protection of the minor. This is only served by clear definitions of abuse that insures [sic] both the immediate protection of the minor, and long-term intervention to assure her continuing safety. Section 261.001 of the Family Code provides such definitions and this section should be the standard whereby the courts of this state determine whether potential abuse exists which justifies bypassing parental notification of a minor's intention to obtain an abortion.

(Emphasis added).

In accord with the foregoing statements and analysis by the legislative amici, I urge the Court to abandon its interpretive hand-wringing and simply apply the true legislative intent that is so eloquently stated by the Act's sponsors. If the Court's true goal—or the goal of any judge attempting to decide a Parental Notification Act case—is to apply the Act consistent with its legislative intent, the Court need look no further than the Amici Curiae brief of Senator Florence Shapiro and Repre-

sentative Dianne White Delisi. Because the Court's analysis and conclusions depart from the true intent of the Legislature, I dissent.